IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KRISTY LYNN MURPHY-TAYLOR,
*et vir*,

    *Plaintiffs*,

    &

UNITED STATES OF AMERICA,

    *Intervenor-Plaintiff*,

    v.

JOHN DENNIS HOFMANN, *et al.*,

    *Defendants*.

Civil Action No. ELH-12-2521

## MEMORANDUM OPINION

Kristy Lynn Murphy-Taylor and her husband, Donald Taylor, plaintiffs, have sued five

defendants, alleging employment discrimination on the basis of sex, under Title VII of the Civil

Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000e *et seq.*, as well as violations of

the federal and Maryland state constitutions and tort claims under Maryland common law.[1]  In

particular, plaintiffs sued R. Gery "Gary" Hofmann, who is the Sheriff of Queen Anne's County,

Maryland ("Sheriff Hofmann"); his brother, John Dennis Hofmann ("Hofmann"); Major James

L. Williams of the Queen Anne County Sheriff's Office; Queen Anne's County; and the State of

Maryland.[2]  In brief, plaintiffs claim that, while Ms. Murphy-Taylor was employed in the Queen

---

[1] As to the federal claims, subject matter jurisdiction is founded on 28 U.S.C. § 1331, with supplemental jurisdiction over the state law claims. *See id.* § 1367.

[2] Plaintiffs' operative pleading is their Amended Complaint (ECF 10), which added the County as a defendant.  Hereafter, references to plaintiffs' "complaint" refer to the Amended Complaint, unless otherwise specified.  In both their original Complaint (ECF 1) and the Amended Complaint, plaintiffs named another defendant, the "Queen Anne's County Office of

Anne's County Sheriff's Office, she was subjected to sexual harassment by several fellow employees, and was repeatedly sexually assaulted by Hofmann, a co-worker. Further, plaintiffs claim that Sheriff Hofmann and Major Williams failed to address the sexual harassment and the assaults, and subsequently retaliated against Ms. Murphy-Taylor for pressing charges against Hofmann for his sexual assault of plaintiff on or about August 25, 2009. Hofmann was convicted of second-degree assault of plaintiff following his guilty plea in May 2011. One day after Hofmann's conviction, Sheriff Hofmann terminated Ms. Murphy-Taylor's employment.

On the basis of these allegations, plaintiffs assert nine counts: a claim of violation of the federal constitutional right to due process, along with claims of failure to train and supervise, pursuant to 42 U.S.C. § 1983 (Count I); deprivation of constitutional rights and privileges, also under § 1983 (Count II); conspiracy to deprive Ms. Murphy-Taylor of the equal protection of the law, again under § 1983 (Count III); violation of Title VII (Count IV); civil conspiracy under Maryland law (Count V); abusive discharge under Maryland law (Count VI); violation of Article 24 of the Maryland Declaration of Rights (Count VII); negligence (Count VIII); and loss of consortium (Count IX).

After plaintiffs filed suit, the United States moved to intervene as a plaintiff, pursuant to 42 U.S.C. § 2000e-5(f)(1), in order to assert Title VII claims against the State, the County, and Sheriff Hofmann in his official capacity. *See* ECF 36.[3] That motion was granted, without opposition, *see* ECF 40, resulting in the docketing of the United States' Plaintiff-Intervenor's

the Sheriff." As discussed, *infra*, claims against that defendant have been dismissed.

[3] Section 2000e-5(f)(1), a provision of Title VII, provides in pertinent part: "Upon timely application, the court may, in its discretion, permit the [Equal Employment Opportunity] Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in [a] civil action [under Title VII] upon certification that the case is of general public importance."

Complaint ("US Complaint") (ECF 41). The United States' complaint contains four counts, all under Title VII. Count I alleges hostile work environment sexual harassment, and the other three counts assert retaliation for engaging in protected activity, by three different modalities: creation of a retaliatory hostile work environment (Count II); retaliatory constructive discharge (Count III); and retaliatory termination (Count IV).

Three motions to dismiss are now pending. Specifically, before the United States intervened, the County had filed a motion to dismiss plaintiffs' claims against it ("County Motion") (ECF 24). In conjunction with the intervention of the United States, I advised the parties that I would consider the County Motion as directed to the United States' complaint as well as plaintiffs' complaint, and permitted further briefing of the motion. *See* ECF 38. Sheriff Hofmann, Major Williams, and the State (collectively, the "State Defendants") have filed two motions: one to dismiss plaintiffs' complaint ("State-Plaintiffs Motion") (ECF 43), and the other to dismiss the United States' complaint ("State-US Motion") (ECF 59).[4] Hofmann has filed an answer denying liability, *see* ECF 44, and did not join in any of the pending motions.

In the course of the briefing of the pending motions, plaintiffs conceded that "all claims against the Office of the Sheriff of Queen Anne's County should be dismissed because this entity is not legally distinct from the State of Maryland itself." ECF 48 at 1. Therefore, they voluntarily dismissed their claims against the Sheriff's Office. *See* ECF 53 & 54. And, plaintiffs did not oppose dismissal of their State law claims against the County. *See* ECF 28 at 1 n.1.[5]

---

[4] Major Williams did not join in the State-US Motion because the United States did not assert any claims against him.

[5] Accordingly, plaintiffs' still-pending State law claims (*i.e.*, Counts VI, VII, VIII, and IX) with respect to the County will be dismissed by the Order that accompanies this Opinion. The dismissal will be with prejudice, because the County's uncontested argument for dismissal is

They also voluntarily dismissed their claims against the State under § 1983 and State law (*i.e.*, all claims against the State except their Title VII claims), and dismissed their State law civil conspiracy claim (Count V) against all defendants. *See* ECF 56 & 57.[6] Thus, as to the individual defendants (Hofmann, Sheriff Hofmann, and Major Williams),[7] all claims remain pending, except the civil conspiracy count. As to the County, only the Title VII and § 1983 claims are pending. And, as to the State, only the Title VII claims are pending.

The motions have been fully briefed,[8] and no hearing is necessary to resolve them. For the reasons that follow, the County's motion will be granted in part and denied in part; the State

---

based on plaintiffs' failure to satisfy the condition precedent of timely notice to the County of their State law claims, pursuant to the Local Government Tort Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol.), §§ 5-301 *et seq.* of the Courts & Judicial Proceedings Article. *See, e.g.*, *Rios v. Montgomery County*, 386 Md. 104, 120, 872 A.2d 1, 10 (2005) (affirming dismissal of suit with prejudice for failure to comply with LGTCA notice requirement); *Ransom v. Leopold*, 183 Md. App. 570, 573-74, 962 A.2d 1025, 1027 (2008) (same).

[6] Maryland law indicates that civil conspiracy is not an independent cause of action. *See, e.g.*, *Alleco, Inc. v. Harry & Jeanette Weinberg Found.*, 340 Md. 176, 189, 665 A.2d 1038, 1045-46 (1995). Nevertheless, plaintiffs maintain that they have sufficiently alleged the liability of Sheriff Hofmann and Major Williams for the substantive State law claims asserted in other counts of their complaint on the basis, *inter alia*, of a civil conspiracy theory. *See* ECF 50 at 2.

[7] Because Hofmann is not a party to any of the pending motions, I will hereafter use the term "Individual Defendants" to refer to Sheriff Hofmann and Major Williams.

[8] In connection with the County Motion, I have considered the motion and its supporting memorandum (ECF 24-2); plaintiffs' opposition ("County-Plaintiffs Opp.") (ECF 28); the County's reply to plaintiffs' opposition ("County-Plaintiffs Reply") (ECF 37); the United States' opposition ("County-US Opp.") (ECF 47); the County's supplemental reply to the United States' opposition ("County-US Reply") (ECF 62); and the surreplies of the United States ("County-US Surreply") (ECF 68) and plaintiffs ("County-Plaintiffs Surreply") (ECF 71), filed with leave of court. *See* ECF 67; *see also* Local Rule 105.2(a).

In connection with the State-Plaintiffs Motion, I have considered the motion and its supporting memorandum (ECF 43-1); plaintiffs' opposition ("State-Plaintiffs Opp.") (ECF 50); and the State Defendants' reply ("State-Plaintiffs Reply") (ECF 61). In connection with the State-US Motion, I have considered the motion and its supporting memorandum (ECF 59-1); the

Defendants' motion will be granted in part and denied in part; and the State Defendants' motion to dismiss the United States' complaint will be denied.

## Factual Background[9]

Ms. Murphy-Taylor was hired as a deputy sheriff by the Queen Anne's County Sheriff's Office in 1999.[10] US Complaint ¶ 13. From June 2005 until July 2010, she served as a detective in the Criminal Investigation Division ("CID") of the Sheriff's Office. *Id.* At various times during her assignment with the CID, four other employees had supervisory responsibility over Ms. Murphy-Taylor: Dennis Hofmann, the Sheriff's brother, who was promoted from the rank of corporal to sergeant and later to first sergeant during Ms. Murphy-Taylor's employment; Captain Curtis Benton; Lieutenant Dale Patrick; and Stephen Stouffer, who was promoted from the rank of detective to corporal during Ms. Murphy-Taylor's employment. *Id.* ¶¶ 13, 29.

Shortly after Ms. Murphy-Taylor's initial assignment to the CID in June 2005, Captain Benton made several remarks to her that were derogatory to women. For example, on one occasion, in regard to the first search warrant that Ms. Murphy-Taylor had served, Captain Benton remarked to her that it was "'the first search warrant a female has ever written and probably will be the last.'" *Id.* ¶ 17. In or around September 2005, Ms. Murphy-Taylor

_____

United States' opposition ("State-US Opp.") (ECF 64); and the State Defendants' reply ("State-US Reply") (ECF 69).

And, I have considered exhibits submitted with the briefing, to the extent permitted by the applicable provisions of the Federal Rules of Civil Procedure, as discussed, *infra*.

[9] The facts are as alleged in the complaints filed by plaintiffs and the United States, and are construed in the light most favorable to plaintiffs. In addition, some facts regarding proceedings before the Equal Employment Opportunity Commission ("EEOC") are derived from exhibits submitted by the parties.

[10] At the time plaintiff was hired, she was not married and was known by her maiden name, Kristy Murphy. As discussed, *infra*, she married plaintiff Brian Taylor before she initiated this suit. For consistency, I will refer to her by her current name.

complained to the Queen Anne's County Human Resources Department ("HRD") about Captain Benton's remarks. Representatives of the HRD told her that nothing could be done about the comments because Captain Benton served in an appointed position. *See id.* ¶ 18.

Beginning in November 2006, Hofmann repeatedly attempted to touch Ms. Murphy-Taylor's breasts, either in the CID offices or in Sheriff's Office vehicles. *Id.* ¶ 19. In or around June 2007, Hofmann sexually assaulted Ms. Murphy-Taylor in a hotel room while they were attending an off-site training course as part of their job duties. *Id.* ¶ 20. In or around August 2007, Ms. Murphy-Taylor complained to the Sheriff about the sexual assault at the training course as well as numerous other sexual assaults committed by Hofmann. *Id.* ¶ 21. However, the Sheriff did not investigate Ms. Murphy-Taylor's complaint or take any corrective action to prevent further assaults, and Hofmann continued to work closely with Ms. Murphy-Taylor and to sexually harass her. *Id.* ¶¶ 22-23. Hofmann was subsequently promoted by the Sheriff. *Id.* ¶ 22.

On or about August 25, 2009, Ms. Murphy-Taylor and Hofmann were riding together in the same Sheriff's Office vehicle, on official business, returning from a court hearing in Cecil County, Maryland. *See id.* ¶ 23; Amended Complaint ¶ 16. Hofmann was driving the vehicle and Ms. Murphy-Taylor was in the front passenger seat. Amended Complaint ¶ 17. While Hofmann was operating the vehicle, he reached over with his right hand and forcefully put it down the front of Ms. Murphy-Taylor's pants, touching her vaginal area. *Id.* He also put his right hand inside Ms. Murphy-Taylor's blouse and touched her right breast. *Id.* ¶ 18. Ms. Murphy-Taylor told Hofmann to stop and tried to push his hand away, but he overpowered her, continued to touch her right breast, and attempted to touch her left breast. *Id.* ¶¶ 19, 20. Ms. Murphy-Taylor again told Hofmann to stop and that she was not feeling well. *Id.* ¶ 21.

On several occasions in November 2009, Lieutenant Patrick and Detective Stouffer made derogatory and sexually explicit comments about Ms. Murphy-Taylor and another female detective, insinuating that Ms. Murphy-Taylor and the other detective had sex at an off-site training that they both attended. *See* US Complaint ¶¶ 24-26. On or about November 18, 2009, Ms. Murphy-Taylor met with then-Captain Williams[11] and the Queen Anne's County Administrator to complain that she had been sexually harassed numerous times on the job. *Id.* ¶ 27. On or about November 20, 2009, and February 2, 2010, Ms. Murphy-Taylor filed written complaints with Captain Williams concerning the sexual harassment. *Id.* ¶¶ 28, 30.

While Ms. Murphy-Taylor's complaints were investigated, she continued to work closely with and was supervised by Hofmann, Lieutenant Patrick, and Detective Stouffer. *Id.* ¶ 31. On April 8, 2010, Ms. Murphy-Taylor complained to Major Williams about continued contact with Hofmann during the investigation, despite her request not to have contact with him. *Id.* ¶ 33. No action was taken in response to this complaint. *Id.* Then, in December 2009, Detective Stouffer was promoted to corporal. *Id.* ¶ 29.

The Sheriff and Sheriff's Office management substantiated Ms. Murphy-Taylor's complaints against Hofmann, Lieutenant Patrick, and Corporal Stouffer. *Id.* ¶ 32, 33. Nevertheless, the Sheriff's Office retained them in their positions and continued to allow them to supervise Ms. Murphy-Taylor. *Id.* ¶ 33. In addition, between December 2009 and July 2010, Ms. Murphy-Taylor "was subjected to numerous other acts of reprisal by the Sheriff and management officials with the Sheriff's Office." *Id.* ¶ 34. For example, she was singled out to receive an undesirable assignment in severe weather; faced disparate treatment in working

_____

[11] Neither plaintiffs nor the United States indicate when Captain Williams was promoted to major.

conditions, such as having a "no personal items at work" policy enforced against her that was not enforced against other CID officers; received a negative performance evaluation on July 20, 2010; and received unjustified criticism of her investigative report writing. Id. She was also subjected to rumors by the Sheriff and senior management in the Sheriff's Office that she had filed sexual harassment complaints against Hofmann because Hofmann had broken off a consensual affair with her and she was a "jilted lover," *id*., notwithstanding that the Sheriff and his management had substantiated Ms. Murphy-Taylor's sexual harassment complaints against Hofmann. *Id.*

On or about February 15, 2010, Ms. Murphy-Taylor filed a charge of discrimination with the EEOC, which was assigned Charge No. 531-2010-00776C. *See* Feb. 2010 Charge of Discrimination, Ex.3 to County-Plaintiffs Reply (ECF 37-1).[12] There, she detailed several instances of sexual assault by Hofmann as well as sexual harassment by Hofmann, Captain Benton, Lieutenant Patrick, and Corporal Stouffer, including but not limited to the incidents detailed, *supra*, which are recounted in the complaints filed by plaintiffs and the United States, as well as her unsuccessful complaints about such conduct to the management of the Sheriff's Office. *See id.*

On May 25, 2010, Ms. Murphy-Taylor and Mr. Taylor were married. *See* State-Plaintiffs Motion at 21.[13] On July 22, 2010, Ms. Murphy-Taylor went on medical leave from the Sheriff's

---

[12] The Feb. 2010 Charge of Discrimination was signed by Ms. Murphy-Taylor and notarized on February 15, 2010, but bears an EEOC date stamp that appears to indicate that it was actually received by the EEOC on February 18, 2010. An incomplete copy of the Feb. 2010 Charge of Discrimination (it is missing the last page) was submitted by plaintiffs as Exhibit 1 to their original Complaint. *See* ECF 1-2. The copy submitted by the County as Exhibit 3 to the County-Plaintiffs Reply appears to be complete.

[13] Although the date of plaintiffs' marriage is not alleged in their complaint, they do not

Office due to the emotional stress of her working conditions. US Complaint ¶ 35. She did not return to work because the Sheriff and his senior management failed to provide her with a work environment that precluded contact with Hofmann, and continued to perpetuate rumors that she had filed her sexual harassment complaints because she and Hofmann had broken off a consensual affair. *Id.*

On or about August 25, 2010, Hofmann was arrested and charged with second-degree assault and a fourth-degree sexual offense, in a case styled *State of Maryland v. John Dennis Hofmann*, No. 07-K-10-001955, in the Circuit Court for Cecil County, in connection with his assault of Ms. Murphy-Taylor a year earlier, in August 2009, and other incidents in which he had assaulted Ms. Murphy-Taylor. Amended Complaint ¶ 23. On May 12, 2011, Mr. Hofmann pleaded guilty to second-degree assault in that proceeding. US Complaint ¶ 36; *see also* Tr. of Plea Hrg. of May 12, 2011, Ex.3 to State-US Opposition (ECF 64-3).[14]

One day later, on May 13, 2011, Ms. Murphy-Taylor received a letter from the Sheriff's Office informing her that her employment was terminated, ostensibly because she had exhausted her leave time.[15] *See* US Complaint ¶ 7; Amended Complaint ¶ 25. According to plaintiffs, this

---

dispute the date of their marriage provided by the State Defendants.

[14] Plaintiffs' complaint quotes from the transcript of the plea hearing and states that the transcript is attached as an exhibit, *see* Amended Complaint ¶ 24, but the transcript was not actually submitted with plaintiffs' original Complaint or Amended Complaint. Plaintiffs' complaint also states that Hofmann pleaded guilty on May 25, 2011. However, the transcript reflects that, as the United States alleges in its complaint, *see* US Complaint ¶ 36, the plea hearing occurred on May 12, 2011. The discrepancy is immaterial.

[15] Plaintiffs and the United States both allege that Ms. Murphy-Taylor received the termination letter on the day after Hofmann's plea hearing. Plaintiffs allege that the termination letter was received on May 26, 2011 (the day after they state that the plea hearing occurred). Amended Complaint ¶ 25. The United States alleges that Ms. Murphy-Taylor was terminated on May 13, 2011. US Complaint ¶ 37. Because the plaintiffs and the United States agree that the

proffered reason for Ms. Murphy-Taylor's termination was "a blatant lie." Amended Complaint ¶ 25. Ms. Murphy-Taylor never received a pre-termination hearing, to which plaintiffs contend she was entitled under the Law Enforcement Officers' Bill of Rights ("LEOBR"), Md. Code (2011 Repl. Vol., 2012 Supp.), §§ 3-101 *et seq.* of the Public Safety Article ("P.S."), despite her several requests for such a hearing. *See* Amended Complaint ¶ 27. In addition, Ms. Murphy-Taylor was not warned before she was terminated that failure to return to work would result in termination, nor was she offered any options in lieu of termination, such as taking leave without pay. *See* US Complaint ¶ 38.

During a workers' compensation hearing for Ms. Murphy-Taylor on August 3, 2011, the Sheriff offered Ms. Murphy-Taylor the option to return to work at the Sheriff's Office. However, this offer entailed returning to work in a demoted position and under Hofmann's supervision, without a guarantee of no contact with Hofmann. *See* US Complaint ¶ 39; Amended Complaint ¶ 29. Ms. Murphy-Taylor declined the offer. Amended Complaint ¶ 29.

Despite Hofmann's guilty plea to the second-degree assault of Ms. Murphy-Taylor, the Sheriff retained him in a supervisory position. US Complaint ¶ 40. In or about November 2011, the Maryland Police Training Commission conducted a hearing to evaluate whether Hofmann had the moral character to remain a Maryland police officer in light of his conviction for second-degree assault. *Id.* ¶ 41. The panel voted 12-0, with one abstention, to decertify Hofmann, and his police license was revoked in December 2011. *Id.* Nevertheless, after Hofmann was decertified, he continued to work for the Sheriff's Office for a period of time. *Id.*

---

termination occurred the day after the plea hearing, and the transcript of the hearing reflects that the hearing took place on May 12, 2011, I have adopted the termination date as alleged by the United States.

On or about April 3, 2012, Ms. Murphy-Taylor filed with the EEOC a supplemental charge of discrimination so as to amend Charge No. 531-2020-00776C to assert additional allegations of retaliation. *See* April 2012 Supplemental Charge of Discrimination, Ex.4 to County-Plaintiffs Reply (ECF 37-2).[16]  In particular, she asserted claims of retaliatory constructive discharge, retaliatory termination, and a claim that she had been retaliatorily blacklisted from employment with law enforcement agencies in Queen Anne's County and surrounding counties.

Plaintiffs filed their original complaint in this Court on August 23, 2012.  *See* ECF 1.  On December 10, 2012, the EEOC issued a Right-to-Sue Letter to Ms. Murphy-Taylor.  *See* Right-to-Sue Letter, Ex.2 to County Motion (ECF 24-4).  Plaintiffs filed their Amended Complaint two days later, on December 12, 2012.  The only substantive change between the Amended Complaint and the original Complaint was the addition of the County as a named defendant.

Additional facts will be included in the Discussion.

**Discussion**

A.  Standard of Review

The defendants' motions are premised in part on Fed. R. Civ. P. 12(b)(6), which governs dismissal for failure to state a claim, and in part on Fed. R. Civ. P. 12(b)(1), which pertains to dismissal for lack of subject matter jurisdiction.

A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of law "to state a claim upon

---

[16] The Amended Charge of Discrimination was signed by Ms. Murphy-Taylor and notarized on April 3, 2012, but bears an EEOC date stamp indicating that it was received by the EEOC on April 5, 2012.

which relief can be granted." Fed. R. Civ. P. 12(b)(6). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Id.* at 555. But, the rule demands more than bald accusations or mere speculation. *Id.*; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Id.* at 555.

Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), make clear that, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Simmons v. United Mortg. & Loan Inv.*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Thus, a Rule 12(b)(6) motion will be granted if the "well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1740 (2010).

"A court decides whether [the Rule 12(b)(6)] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy he or she seeks. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (internal citation omitted).

A motion pursuant to Rule 12(b)(6) typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. In addition, on a motion to dismiss under Rule 12(b)(6), a court "[o]rdinarily . . . may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). In considering a Rule 12(b)(6) dismissal, however, the court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the motion to dismiss, "so long as they are integral to the complaint and authentic." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).[17]

---

[17] In the County's reply to the United States' opposition to the County Motion, the County suggested that, with respect to the issue of whether the County was Ms. Murphy-Taylor's "employer" within the meaning of Title VII, the Court might be required to construe the County Motion as a motion for summary judgment, pursuant to Fed. R. Civ. P. 12(d). Under Rule 12(d), a court has a court has the discretion to consider matters outside of the pleadings in conjunction with a Rule 12(b)(6) motion, so long as the court treats the motion "as one for summary judgment under Rule 56," Fed. R. Civ. P. 12(d), gives all parties "a reasonable opportunity to present all the material that is pertinent to the motion," *id.*, and gives the parties notice of its intent to consider the motion under a summary judgment standard. *See Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *accord Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

As I informed the parties in an Order issued on April 26, 2013 (ECF 67), it is

The jurisdictional issues that must be resolved under Fed. R. Civ. P. 12(b)(1) are those concerning whether plaintiffs adequately exhausted their Title VII claims with the EEOC before filing suit. Fourth Circuit precedent indicates that failure to exhaust administrative remedies under Title VII should be addressed by way of a motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1). *See Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406 (4th Cir. 2013) ("[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies."); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009).

A test of subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true,'" or that other facts, outside the four corners of the complaint, preclude the exercise of subject matter jurisdiction. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *see also Buchanan v. Consol. Stores*

---

unnecessary to consider the County Motion under a summary judgment standard pursuant to Rule 12(d) because all of the documents purportedly extrinsic to the pleadings that the County submitted with its reply consist of state statutes, county ordinances, and legislative history documents that are proper subjects of judicial notice under a Rule 12(b)(6) standard, without conversion to summary judgment. *See Clatterbuck*, *supra*, 708 F.3d at 557-58 (stating that an "ordinance itself and its legislative history [are] 'legislative facts,' . . . and are 'not a matter beyond the pleadings but . . . an adjunct to the ordinance which may be considered by the court as a matter of law,'" under "a narrow exception to the principle embodied in Rule 12(d) that allows a court to consider facts and documents subject to judicial notice without converting the motion into one for summary judgment") (citation omitted).

The United States submitted two documents with its opposition to the County Motion that, at least arguably, would necessitate conversion under Rule 12(d) if I were to consider them. *See* Ex.1 to County-US Opposition (ECF 47-1) (printout of Queen Anne's County website); Ex.6 to County-US Opposition (ECF 47-6) (copy of notice of "mandatory training on harassment in the workplace" presented by Queen Anne's County). Accordingly, I have not relied on either document in resolving the pending motions.

*Corp.*, 125 F. Supp. 2d 730, 736 (D. Md. 2001). This case presents a factual challenge. Defendants have submitted certain filings arising from plaintiff's administrative claim proceeding with the EEOC in order to demonstrate that plaintiffs failed to exhaust the claims they assert in this proceeding. In opposition, plaintiffs and the United States have submitted some additional EEOC filings.

In a factual challenge to subject matter jurisdiction, "the plaintiff bears the burden of proving" that subject matter jurisdiction is satisfied "by a preponderance of the evidence." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir.), *cert. denied*, 558 U.S. 875 (2009). In that circumstance, the court "may regard the pleadings as mere evidence on the issue[,] . . . may consider evidence outside the pleadings without converting the proceeding to one for summary judgment," *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004), and may also "resolve the jurisdictional facts in dispute by considering [the] evidence outside the pleadings . . . ." *Vuyyuru*, 555 F.3d at 348 (citation omitted). If necessary, the court may also "hold an evidentiary hearing to determine whether the facts support the jurisdictional allegations," *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999), at which it may "decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. However, as there is no factual dispute regarding what was filed in the EEOC proceeding and when, there is no need for an evidentiary hearing in this case.[18]

_____

[18] Notably, certain arguments asserted by defendants pertain not to the adequacy of administrative exhaustion, but to the timeliness of plaintiffs' filing of their administrative claims and their initiation of this lawsuit. Under Supreme Court and Fourth Circuit precedent, the time limits under Title VII for filing administrative claims and for initiating litigation are not jurisdictional requirements. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 398 (1982); *Jones*, *supra*, 551 F.3d at 300 & n.2; *Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 662-63 (D. Md. 2011). Rather, the time limits are treated "'like a statute of limitations'": as

## B.  Title VII: Administrative Exhaustion and Timeliness

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex, among other illegitimate considerations.  Under Title VII, a "person aggrieved" by an alleged unlawful discriminatory employment practice must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within a specified time "after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e-5(e)(1), and "cannot bring suit until he has exhausted the administrative process."  *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005).  The time allotted to file a charge under Title VII depends on whether the complainant files the charge in a jurisdiction that has a state or local law prohibiting employment discrimination on the same bases that are covered by Title VII and authorizing a state or local agency to grant or seek relief from such discrimination.  Such a state or local jurisdiction is sometimes called a "deferral" jurisdiction.  *See, e.g.*, *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 & n.3 (4th Cir. 2002); *Prelich*, *supra*, 813 F. Supp. 2d at 661-62 (D. Md. 2011).

---

affirmative defenses that must be raised by the defendant and that are "'subject to waiver, estoppel, and equitable tolling.'"  *Chacko v. Patuxent Inst.*, 429 F.3d 505, 513 n.5 (4th Cir. 2005) (quoting *Zipes*, 455 U.S. at 393).

A copy of plaintiffs' original charge of discrimination with the EEOC was filed with plaintiffs' complaint, and other filings in the EEOC proceeding, including plaintiffs' supplemental charge, arguably could be considered as documents that are integral to the complaint and thus appropriate for consideration under a Rule 12(b)(6) standard in connection with the issues pertaining to time limitations.  On the other hand, the EEOC filings arguably might constitute matters outside the pleadings that cannot be considered unless defendants' motions are construed, pursuant to Fed. R. Civ. P. 12(d), as motions for summary judgment.  *See generally Garrison v. McCormick & Co., Inc.*, Civ. No. JFM-10-298, 2010 WL 2651639, at *1 n.2 (D. Md. June 30, 2010) (comparing decisions that have considered EEOC filings under either rubric).  In this case, the issue is essentially academic, because there is no factual dispute or need for discovery regarding the content of the documents filed with the EEOC or the timing of the various filings.  Rather, the parties' disputes in this regard turn on proper application of the governing legal precedents to the undisputed facts.  Thus, my decision would be the same regardless of the standard of review.

In a deferral jurisdiction, the limitations period is 300 days; otherwise, the period is 180 days. *See* 42 U.S.C. § 2000e-5(e)(1); *see also Prelich*, 813 F.Supp.2d at 661-62. Maryland is a deferral state under Title VII. *See EEOC v. R&R Ventures*, 244 F.3d 334, 338 n.* (4th Cir. 2001).[19] Therefore, Ms. Murphy-Taylor was required to file an administrative charge of discrimination within 300 days after the occurrence of the alleged employment discrimination.

Once a charge is filed with the EEOC in a deferral jurisdiction, as in this case, the EEOC must refer the charge to the state or local enforcement agency in the jurisdiction, and ordinarily must "afford [the state or local agency] a reasonable time, but not less than sixty days . . . to act under . . . State or local law to remedy the practice alleged." 42 U.S.C. § 2000e-5(d). Thereafter, the EEOC must notify the employer against whom the charge has been filed of the pendency of the charge and must investigate the charge to determine whether there is reasonable cause to believe that unlawful discrimination has occurred. *See* 42 U.S.C. § 2000e-5(b). If the EEOC makes a finding of reasonable cause, it must "endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." *Id.* The federal government (acting through the EEOC or, in a case such as this involving a respondent that is a "government, governmental agency, or political subdivision," through the Justice Department) may initiate litigation if conciliation is unsuccessful. *See* 42 U.S.C. § 2000e-5(f)(1). On the other hand, if the EEOC does not find reasonable cause, it must dismiss the charge. *See* 42 U.S.C. § 2000e-5(b).

As the Fourth Circuit explained in *Sydnor v. Fairfax County*, 681 F.3d 591, 593 (4th Cir. 2012) (internal citations omitted):

---

[19] The applicable state enforcement agency is the Maryland Commission on Civil Rights ("MCCR"), formerly known as the Maryland Commission on Human Relations.

Rather than "a formality to be rushed through," [the] exhaustion requirement is "an integral part of the Title VII enforcement scheme." For one thing, requiring a party to file a charge with the EEOC "ensures that the employer is put on notice of the alleged violations," thereby giving it a chance to address the alleged discrimination prior to litigation. This means that injured parties can often obtain relief far earlier than they would be able to in the courts, where "the ponderous pace of formal litigation" can force "victims of discrimination . . . to wait while injustice persists." For another, the requirement places the resolution of employment discrimination disputes initially in the hands of the EEOC. Allowing this agency the first crack at these cases respects Congress's intent "to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes."

If the EEOC dismisses a charge of discrimination or if the federal government has neither filed suit against the respondent nor achieved a conciliation agreement within 180 days after either (1) the charge is filed or (2) the sixty day reference period in a deferral jurisdiction expires, whichever is later, the EEOC must give notice to the complainant of the complainant's right to file suit. *See* 42 U.S.C. § 2000e-5(f)(1). This notice is commonly called a "right-to-sue letter." *See, e.g.*, *Laber v. Harvey*, 438 F.3d 404, 416 (4th Cir. 2006). A complainant has ninety days to file suit in federal or state court after being notified of the right to sue. *See* 42 U.S.C. § 2000e-5(f)(1); *see also Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820 (1990) (holding that state courts have concurrent jurisdiction with federal courts to adjudicate Title VII claims).

In this case, plaintiffs alleged in their complaint that Ms. Murphy-Taylor filed her charge of discrimination on February 15, 2010, and that "[t]his suit is proper because it has been more than 180 days and the EEOC has not yet issued a decision." Amended Complaint ¶ 14. As noted, plaintiffs filed their original complaint on August 23, 2012. It is undisputed that the EEOC did not issue a right-to-sue letter to Ms. Murphy-Taylor until December 10, 2012.

The County and the State Defendants argue that the Court lacks jurisdiction over plaintiffs' Title VII claims because plaintiffs filed suit before a right-to-sue letter was issued.[20] Plaintiffs counter that issuance of a right-to-sue letter is not a prerequisite to suit. Rather, plaintiffs maintain that a Title VII complainant may file suit in federal court once he or she is entitled to receive a right-to-sue letter, regardless of whether one has actually been issued.

As indicated, after a claim of discrimination is filed in regard to a Title VII matter, the EEOC is directed to issue a right-to-sue letter in a deferral jurisdiction within, at the latest, 180 days plus the sixty-day deferral period (*i.e.*, 240 days), if the EEOC does not earlier dismiss the claim for lack of probable cause, achieve a conciliation agreement, or initiate litigation. Because well over 240 days (indeed, 920 days) elapsed between February 15, 2010, when Ms. Murphy-Taylor filed her claim of discrimination, and August 25, 2012, when plaintiffs filed suit, she reasons that she was entitled to receive a right-to-sue letter and therefore was entitled to sue, despite the fact that an actual right-to-sue letter had not yet been issued.

Governing Fourth Circuit law forecloses defendants' position. In *Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091, 1093 (4th Cir. 1982), the Fourth Circuit squarely held that "it is entitlement to a 'right to sue' notice, rather than its actual issuance or receipt, which is a prerequisite to the jurisdiction of the federal courts" under Title VII. The *Perdue* Court reasoned:

---

[20] The State Defendants frame the issue slightly differently, as one concerning the adequacy of plaintiffs' pleading. The State Defendants maintain that suit must be dismissed because plaintiffs' did not *allege* in their complaint that they had received a right-to-sue letter before filing suit, and therefore failed to allege facts giving rise to subject matter jurisdiction. However, plaintiffs stated in their complaint that they filed a charge of discrimination with the EEOC and asserted that their entitlement to a right-to-sue letter had ripened, and there is no factual dispute that, in fact, they had not received a right-to-sue letter when they filed suit. Thus, the question is whether the facts that plaintiffs alleged, which are not disputed, suffice to establish satisfaction of the jurisdictional requirement of administrative exhaustion.

> Section 2000e-5(f)(1) requires EEOC to issue a "right to sue" notice if, within 180 days after a charge is brought, the Commission has neither filed suit in its own name nor achieved a private settlement. Thus, a charging party is entitled to such notice if the appropriate conditions exist. The Commission's failure actually to issue the notice cannot defeat the complainant's statutory right to sue in the district court, for '(a) Title VII complainant is not charged with the commission's failure to perform its statutory duties' . . . . Nothing in [Supreme Court case law] precludes this rule, which is simply an application of the maxim that equity regards as done that which ought to have been done.

*Perdue*, 690 F.2d at 1093 (internal citations and footnote omitted); *accord Davis v. N.C. Dept. of Corrections*, 48 F.3d 134, 140 (4th Cir. 1995) ("[R]eceipt of, *or at least entitlement to*, a right-to-sue letter is a jurisdictional prerequisite that must be alleged in a [Title VII] plaintiff's complaint.") (emphasis added); *Moore v. City of Charlotte*, 754 F.2d 1100, 1104 n.1 (4th Cir.) ("Entitlement to the letter, without actual receipt of it, is sufficient to support federal jurisdiction."), *cert. denied*, 472 U.S. 1021 (1985); *Veliaminov v. P.S. Business Parks*, 857 F. Supp. 2d 589 (E.D. Va. 2012) (holding that plaintiff "was entitled to a right-to-sue letter regarding his Title VII claims at the time he filed the Complaint in this Court" and thus the court had "subject matter jurisdiction over Plaintiff's Title VII claim"; and "[a]dditionally, Plaintiff's receipt of the right-to-sue letter from the EEOC prior to dismissal cures any potential defect"); *see also EEOC v. W.H. Braum, Inc.*, 347 F.3d 1192, 1200 (10th Cir. 2003) (stating that, where an aggrieved employee files suit after the expiration of the 180 days, . . . jurisdiction over his or her claim exists, even if a right-to-sue letter was not actually received," and that "jurisdiction arises at this time in order to protect the employee") (citing *Perdue*).

To be sure, some subsequent decisions have, in passing, described receipt of a right-to-sue letter as a prerequisite to suit. *See, e.g., Puryear v. County of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000) ("[T]he aggrieved person may initiate a civil action based on the Title VII claims

made in her EEOC charge only after receipt of a right-to-sue letter."); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 878 (4th Cir.) (recounting defendant's argument that plaintiff "failed to file her claim with the EEOC and had not obtained a right to sue letter, both prerequisites to filing . . .Title VII claims in court"), *cert. denied*, 519 U.S. 980 (1996); *Long v. Ringling Bros.–Barnum & Bailey Combined Shows, Inc.*, 9 F.3d 340, 342 (4th Cir. 1993) ("Long satisfied the jurisdictional prerequisites for Title VII '(i) by filing timely charges of employment discrimination with the [EEOC] and (ii) by receiving and acting upon the [EEOC's] statutory notice of the right to sue.'  Title VII 'specifies with precision' these two prerequisites.  They are the only prerequisites a claimant must satisfy.") (internal citations omitted).  But, none of these cases addressed the issue of whether entitlement to a right-to-sue letter, without actual issuance of the letter, was sufficient to satisfy the statutory prerequisite to litigation, and none of them discussed *Perdue* or its progeny.

I am satisfied that statements in the case law, cited above, are merely oversimplifications of the rule that is more accurately stated in *Perdue*.  Accordingly, plaintiffs' initiation of this suit before the EEOC issued a right-to-sue letter presents no jurisdictional impediment.

The State Defendants next contend that the claims of retaliatory termination and retaliatory constructive discharge asserted both by plaintiffs, as a component of their Title VII count, and by the United States, in Counts III and IV of its complaint, were not administratively exhausted with the EEOC. The State Defendants' argument is that the retaliation claims were not asserted in Ms. Murphy-Taylor's original Charge of Discrimination, filed on February 15, 2010.

"The scope of the plaintiff's right to file a federal lawsuit [under Title VII] is determined by the . . . contents" of the charges filed by the plaintiff with the EEOC or corresponding state

agency during the process of exhaustion.  *Jones*, *supra*, 551 F.3d at 300 (citation omitted).  Put another way, "'[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent . . . lawsuit.'"  *Id.* (citation omitted).

Of course, there is a good reason that these retaliation claims were not asserted in the February 2010 charge: the facts giving rise to the retaliation claims had not yet come to pass.  As to the retaliatory termination claims, plaintiff's employment was not terminated until May 2011, over a year after the original Charge of Discrimination was filed.  As to constructive discharge, in order "[t]o establish constructive discharge, a plaintiff must be able to show that [her] former employer 'deliberately made an employee's working conditions intolerable, and thereby forced [her] to quit.'"  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir.) (citation omitted), *cert. denied*, 543 U.S. 959 (2004).  The theory underlying the constructive discharge claims in this case is that Ms. Murphy-Taylor's decision to go on an extended medical leave from which she never returned was tantamount to quitting due to the intolerable conditions of her employment.  However, Ms. Murphy-Taylor did not take medical leave until July 2010, several months after she filed her original charge of discrimination.

The State Defendants acknowledge that Ms. Murphy-Taylor asserted her retaliation claims in her supplemental charge of discrimination, filed with the EEOC on April 3, 2012.  However, they argue that the supplemental charge was untimely because it was filed more than 300 days after the termination of Ms. Murphy-Taylor.  Accordingly, the State Defendants reason that the claims are time-barred.

The State Defendants rely on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), in which the Supreme Court held that a plaintiff cannot recover "for discrete acts of discrimination or retaliation that occur outside the statutory [300-day] time period," *id.* at 105, even if the discrete act is "related to acts alleged in timely filed charges." *Id.* at 113. In other words: "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* A "discrete act" or "incident of discrimination" includes such actions as "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114; *accord Gilliam v. S.C. Dept. of Juvenile Justice*, 474 F.3d 134, 140-41 & n.8 (4th Cir. 2007).[21]

The State Defendants' argument is unfounded for two reasons. First, while Ms. Murphy-Taylor's original charge was pending before the EEOC, the supplemental charge of discrimination was filed for the express purpose of amending the original charge. In *Edelman v. Lynchburg College*, 535 U.S. 106 (2002), the Supreme Court upheld, as an "unassailable interpretation" of Title VII's charge requirements, *id.* at 118, the EEOC's regulatory "relation-back" provisions, *see* 29 C.F.R. § 1601.12(b), which dictate that a petitioner may supplement or amend a charge after it is filed so as to include "amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the

---

[21] The State Defendants do not challenge the administrative exhaustion or timeliness of the hostile work environment claims in this suit, perhaps because the *Morgan* Court articulated a different rule for "hostile environment claims." In such a case, the "'unlawful employment practice' . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts." *Morgan*, 536 U.S. at 115 (internal citations omitted). Therefore, in a hostile environment claim, when the "employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has 'occurred,' even if it is still occurring" and, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

- 24 -

original charge." *Id*. Those supplements or amendments "will relate back to the date the charge was first received." *Id*. Ms. Murphy-Taylor's original charge was still pending with the EEOC when she filed her supplemental charge, and her supplemental charge was filed under the same charge number, amending the original charge to add new allegations of unlawful employment practices that clearly related to the subject matter of the original charge. Therefore, it is of no moment that the supplemental charge was filed more than 300 days after the incidents it alleges.

Second, even if Ms. Murphy-Taylor had not filed the supplemental charge, binding circuit precedent indicates that her original charge would have been sufficient, for exhaustion purposes, as to claims of subsequent retaliatory termination and constructive discharge. In *Jones*, *supra*, 551 F.3d 297, the Fourth Circuit expressly rejected the interpretation of *Morgan* that is advanced by the State Defendants. As the *Jones* Court explained, *Morgan* "does not purport to address the extent to which an EEOC charge satisfies exhaustion requirements for claims of related, post-charge events." *Id.* at 303.

In *Jones*, the plaintiff filed an EEOC charge claiming that, in retaliation for filing an earlier EEOC charge that had been resolved by conciliation, she was being "'forced to work in a hostile environment and subjected to differential treatment'" by her employer. *Id.* at 299 (quoting charge). The EEOC issued the plaintiff a right-to-sue letter. *Id.* Between the date that the right-to-sue letter was issued and the date that the plaintiff sued in federal court, she was fired by her employer. *Id.* In the federal suit that followed, plaintiff alleged that her employer had discharged her in further retaliation for her EEOC charges. *Id.* Despite the fact that the retaliatory discharge claim had not been asserted and, indeed, could not have been asserted in the plaintiff's EEOC charge, the Fourth Circuit held that the retaliatory discharge claim had been

administratively exhausted.  *Id.* at 304.  According to the Court, "the alleged retaliatory termination was merely the predictable culmination of [the employer's] alleged retaliatory conduct," and so "the claim of retaliatory termination was reasonably related to the allegations of the [EEOC] charge."  *Id.*

So too here.  In her original charge of discrimination, Ms. Murphy-Taylor marked the box indicating that she was complaining of retaliation for engaging in protected activity, and also checked the box for discrimination on the basis of sex.  *See* Feb. 2010 Charge of Discrimination at 1.  Moreover, in Paragraph 13 of the charge, she alleged an act of "[c]ontinuing [r]etaliation" with respect to her complaints to Sheriff's Office management regarding her sexual harassment and assault by other officers.  Specifically, she asserted that she was singled out to receive an assignment of road patrol under snowy conditions, an assignment that "[n]o one else from a specialized division" received.  *Id.* ¶ 13.  As in *Jones*, defendants' subsequent alleged further retaliation against Ms. Murphy-Taylor by terminating or constructively discharging her was the "predictable culmination" of the earlier alleged course of discriminatory and retaliatory conduct.  *Jones*, 551 F.3d at 304.

*Jones* is an example of the general principle that an EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.'"  *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (quoting *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002)).  Put another way, the scope of a subsequent lawsuit may be broader than the language of the EEOC charge.  "If a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow

from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). When an employer discharges a Title VII plaintiff during the pendency of her EEOC charge, allegedly as part of a continuing practice of retaliation by the employer against the plaintiff, a claim of retaliatory discharge "can be expected to follow from a reasonable administrative investigation" of the original charge. *Id.* Accordingly, the retaliation claims brought by plaintiffs and the United States are not subject to dismissal for failure to exhaust administrative remedies.

As a final challenge to plaintiffs' administrative exhaustion of their claims, the County asserts that it was not named as a respondent in plaintiffs' claim of discrimination and that there is no "substantial identity" between it and the Sheriff so as to support the filing of a civil action against a defendant not named in the plaintiff's EEOC charge. *See* County Motion at 19-22. Thus, the County maintains that plaintiffs did not administratively exhaust their claims with respect to the County, even if they did so with respect to other defendants.

This argument is dead on arrival, because plaintiffs' original charge of discrimination in February 2010 clearly named "Queen Anne's County, John P. Borders, Jr., County Manager" as a respondent to the charge, in addition to the "Queen Anne's Co. Office of the Sheriff." *See* Feb. 2010 Charge of Discrimination at 2. After plaintiffs pointed this out in their opposition to the County Motion, the County's only rejoinder was to state, in reply, that "[c]onspicuous in its absence . . . is any mention of the fact that when [Ms. Murphy-Taylor] amended her Charge of Discrimination of April 3, 2012, the County was not named as a Respondent." County-Plaintiffs Reply at 6 n.2. To be sure, the respondent in the supplemental charge of discrimination is listed, ambiguously, as "Queen Anne's County – Office of Sheriff." April 2012 Charge of

Discrimination at 1. But, as the United States points out, the EEOC sent notice of both the original charge and the supplemental charge to the County via the County Administrator and also sought to engage the County in the investigation and conciliation process. Despite the EEOC's efforts, the County declined to participate in the EEOC proceeding because it maintained that the Sheriff, rather than the County, was Ms. Murphy-Taylor's employer. *See* County-US Opposition at 9-10; *see also* Ex.2, 3, 4 & 5 to County-US Opposition (ECF 47-3, 47-4, 47-5 & 47-6) (notices of charges of discrimination sent to County and correspondence between EEOC and County). Accordingly, I see no merit in the County's argument.

Having addressed defendants' arguments concerning the prerequisites to suit under Title VII, I turn to their arguments concerning the sufficiency of the complaints to state substantive claims for relief.

### C. Title VII: State Defendants' Liability

At the outset, the State Defendants correctly assert that the Individual Defendants are not subject to suit under Title VII in their individual capacities. *See Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998) ("[S]upervisors are not liable in their individual capacities for Title VII violations."). Accordingly, individual-capacity claims under Title VII, to the extent asserted by plaintiffs, will be dismissed.[22]

---

[22] As noted, the United States expressly limited its claims against Sheriff Hofmann to his official capacity and did not sue Major Williams in any capacity.

Although Hofmann did not join in the State Defendants' motion, I will also dismiss plaintiffs' claims to the extent they allege Title VII claims against Hofmann in his individual capacity, because such claims are deficient as a matter of law. *See, e.g., J & J Sports Prods., Inc. v. MayrealII, LLC*, 849 F. Supp. 2d 586, 592 (D. Md. 2012) (dismissing claims against defendant who had not joined in motion to dismiss where "plaintiff's allegations as to [non-moving defendant's] liability are indistinguishable from those against" moving defendant, "plaintiff has

Aside from their challenge to any individual-capacity claims, the State Defendants do not contest the sufficiency of the pleadings filed by plaintiffs and the United States as to the claims of a hostile work environment under Title VII.[23] However, they level three challenges against the United States' claims of retaliatory termination and retaliatory constructive discharge (*i.e.*, Counts III and IV of the United States' complaint).[24]

---

had a full opportunity to brief the sufficiency of the allegations and, as a matter of law, they are equally deficient as to" non-moving defendant) (citing cases).

Notably, although the Individual Defendants cannot be individually liable under Title VII, their actions and motivations are relevant to an analysis of employer liability. *See, e.g.*, *Staub v. Proctor Hosp.*, ___ U.S. ___, 131 S. Ct. 1186, 1194 (2011) (adopting, in the context of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), a statute that the Court remarked was "very similar to Title VII," *id.* at 1191, the so-called "cat's paw" theory of liability, *i.e.*, that, "if a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable," even if the ultimate decision maker as to the adverse action did not have a discriminatory animus) (emphasis in original); *see also Vance v. Ball State Univ.*, ___ U.S. ___, 133 S. Ct. 2434, 2439, 2443 (2013) (holding that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim," *i.e.*, "to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

[23] A claim of hostile work environment under Title VII is premised on the notion that "an employee's work environment is a term or condition of employment." *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009) (internal citations and quotation marks omitted). In general, to prove a hostile work environment claim, "a plaintiff-employee must prove that (1) the conduct [that he or she experienced in the workplace] was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013). Because the pending motions do not challenge the sufficiency of the allegations of a hostile work environment, I need not further discuss the law governing such claims.

[24] These arguments are not expressly asserted in the State Defendants' motion to dismiss plaintiffs' complaint. However, to the extent that plaintiffs' complaint pleads theories of retaliatory termination or constructive discharge, the same legal analysis would apply.

First, the State Defendants argue that Counts III and IV do not plausibly plead causation. Under Title VII's prohibition of retaliation, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). In order to state a claim of retaliation under Title VII, "plaintiffs must allege (1) that they engaged in protected conduct, (2) that they suffered an adverse action, and (3) that a causal link exists between the protected conduct and the adverse action." *A Society Without A Name*, *supra*, 655 F.3d at 350; *accord Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).[25]

With respect to the causation element, ordinarily there must be "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). However, in "cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (citation omitted). Conversely, mere temporal proximity is not necessarily enough to create a jury issue

---

[25] As to the second element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Clearly, termination of employment satisfies the second element. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 n.2 (4th Cir. 2007).

as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). Moreover, pursuant to the Supreme Court's ruling this past term in *University of Texas Southwestern Medical Center v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517 (2013), decided after the completion of the briefing of the instant motions, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534. It is insufficient merely "to show that the motive to [retaliate] was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.* at 2523.

According to the State Defendants, the United States has failed to allege facts that plausibly suggest causation. As the State Defendants see it, "the latest action by Ms. Murphy-Taylor that could be construed as a protected activity is her April 8, 2010, complaint to Major Williams about continued contact with Dennis Hofmann," which was "more than 11 months before the alleged retaliatory discharge." State-US Motion at 7. Furthermore, "[i]f the protected activity in question is her filing of a charge of discrimination on February 15, 2010, then there is an even longer gap—15 months—between her discharge and the protected activity." *Id.* However, the State Defendants suggest that, because a "plaintiff cannot prove causation without showing that the decisionmaker actually had knowledge of the protected activity at the time the

decisionmaker decided to take the adverse action," *Mezu v. Morgan State Univ.*, 2010 WL 1068063, at *10 (D. Md. Mar. 18, 2010) (citing *Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001), and *Gibson v. Old Town Trolley Tours of Wash., D.C. Inc.*, 160 F.3d 177, 181-82 (4th Cir. 1998)), the correct date to evaluate should be the date of the latest protected activity of which Sheriff Hofmann was aware. State-US Motion at 8. The State Defendants note that the complaint does not specifically allege that Sheriff Hofmann was aware of Ms. Murphy-Taylor's February 2010 EEOC claim or her internal complaint of April 5, 2010. Rather, according to the State Defendants, "the only protected activity that Sheriff Hofmann knew of" was "the August 2007 complaint to the Sheriff of sexual assaults by Dennis Hofmann." *Id.* The gap between that date and Ms. Murphy-Taylor's termination was 51 months, a span of time that, as the State Defendants see it, is not suggestive of a causal link.

In my view, the United States has plausibly alleged a causal nexus between Ms. Murphy-Taylor's protected complaints regarding sexual harassment and assault and both her alleged constructive discharge (when Ms. Murphy-Taylor went on medical leave in July 2010) and her actual termination (in May 2011). As to the constructive discharge claim, Ms. Murphy-Taylor engaged in a series of protected activities in the first half of 2010, including the filing of her charge of discrimination in February, and her complaint to Major Williams regarding continued contact with Hofmann in April. She alleges a host of retaliatory actions taken against her throughout this time period, culminating in a negative performance review on July 20, 2010, only two days before she went on medical leave.

As to plaintiff's actual termination, the plausible inference of causation is stronger still. Ms. Murphy-Taylor was fired one day after Hofmann pleaded guilty to the second-degree assault

of Ms. Murphy-Taylor.  As the United States observes, "Sheriff Hofmann had a very significant reason to wait until after the sentencing—Ms. Murphy-Taylor had the right as the victim of his brother's crime to object to his guilty plea and to testify at his sentencing, which could have resulted in his brother receiving a harsher sentence."  State-US Opposition at 23.

Moreover, I disagree with the State Defendants' contention that the complaint does not permit the inference that the Sheriff knew of Ms. Murphy-Taylor's protected activities after August 2007.  Indeed, the opposite inference is far more readily drawn; it is hard to conceive that the Sheriff did not know of Ms. Murphy-Taylor's subsequent protected complaints, given that she made them to members of his senior staff; that her EEOC charges were directed to the Office of the Sheriff; and that many of Ms. Murphy-Taylor's complaints, and the most serious of them, concerned Hofmann, the Sheriff's own brother, and resulted in Hofmann's criminal conviction. Especially in the context of a motion to dismiss, when all plausible inferences from the well-pleaded facts must be drawn in plaintiffs' favor, there is no basis to conclude that the United States failed adequately to plead causation.

The State Defendants' other two challenges pertain specifically to the United States' claim of constructive discharge.  The State Defendants argue that constructive discharge does not constitute an independent cause of action under Title VII, and that a constructive discharge claim is not viable if Ms. Murphy-Taylor was actually discharged.

"A constructive discharge involves both an employee's decision to leave and precipitating conduct . . . ."  *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).  "To establish constructive discharge, a plaintiff must be able to show that [her] former employer 'deliberately made an employee's working conditions intolerable, and thereby forced [her] to quit.'"  *James v.*

*Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir.), *cert. denied*, 543 U.S. 959 (2004)));

*see McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 574 (D. Md. 2000) ("To advance a claim

for 'constructive discharge,' the plaintiff must establish: (1) the employer deliberately made an

effort to force the employee to quit; and (2) that the working conditions were intolerable."

*Accord Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 262 (4th Cir. 2006).

    With regard to tolerability, courts look objectively at the working conditions. *Matvia v.*

*Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001); *see Heiko*, 434 F.3d at 262

("Whether an employment environment is intolerable is determined from the objective

perspective of a reasonable person.").    For instance, "mere 'dissatisfaction with work

assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions

are not so intolerable as to compel a reasonable person to resign.'"    *James*, 368 F.3d at 378

(quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)); *accord Heiko*, 434 F.3d at 262; *see*

*Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004).  "Even a 'slight decrease in pay

coupled with some loss of supervisory responsibilities, is insufficient evidence of constructive

discharge.'"    *James*, 368 F.3d at 378 (quoting *Carter*, 33 F.3d at 459)).    With regard to

deliberateness, "[a]n employer's actions are deliberate only if they 'were intended by the

employer as an effort to force the plaintiff to quit.'"    *Heiko*, 434 F.3d at 262 (quoting *Matvia*,

259 F.3d at 272).

    In support of their assertion that constructive discharge is not an independent cause of

action, the State Defendants rely on a statement in an unreported decision in this district, in

which the court stated that "[c]onstructive discharge . . . is not an independent basis for relief, but

rather a legal fiction under which an employee's voluntary resignation may be deemed a

termination by the employer." *Reed v. Action Prods., Inc.*, Civ. No. JKB-12-409, 2012 WL 2711051, at *2 (D. Md. July 6, 2012). According to the State Defendants, "constructive discharge is simply another way of alleging a retaliatory discharge." State-US Motion at 12.

If this case involved two counts based on exactly the same facts as each other, one labeled "retaliatory discharge" and the other labeled "retaliatory constructive discharge," as was essentially the case in *Reed*, I might well agree with defendants that one of the two was redundant, and that a single count could serve as the vehicle for both theories of liability. *See Reed*, 2012 WL 2711051, at *2 ("Count II merely restates the claim that the alleged facts constitute constructive discharge."). However, Counts III and IV of the United States' complaint each assert a different factual basis for liability. The retaliatory actual discharge count (Count IV) is based on Ms. Murphy-Taylor's receipt of a letter expressly terminating her employment on May 13, 2011; the retaliatory constructive discharge count (Count III) is based on Ms. Murphy-Taylor's decision on July 22, 2010, to take medical leave rather than remain at her workplace. In evaluating a complaint under the pleading standard established by *Iqbal* and *Twombly*, a court must focus on whether the complaint contains "enough factual matter (taken as true) to suggest" a cognizable cause of action, *Twombly*, 550 U.S .at 556, that "is plausible on its face." *Id.* at 570. How a claim is labeled is of secondary importance, because a reviewing court must disregard "labels and conclusions." *Id.* at 555.

Even if plaintiff had titled both Count III and Count IV as claims of "retaliatory discharge" under Title VII, both state separate, non-redundant claims for relief because the two counts rely on separate factual foundations. In this regard, *White v. Honeywell, Inc.*, 141 F.3d 1270, 1279 (8th Cir. 1998), is instructive. There, in a case of apparent first impression for the

federal appellate courts, the Eighth Circuit held that under Title VII "a situation where allegedly intolerable working conditions force an employee into an unpaid medical leave of absence from which she is allegedly unable to return is essentially the same as forcing an employee to 'quit' for purposes of proving a constructive discharge claim." The court explained, *id.*:

> We are not prepared to say that "quit" is the magic word in a constructive discharge instruction. A person who has suffered a forced unpaid medical leave of absence, from which she is unable to return and which resulted from objectively intolerable working conditions, is in no better position than one who was forced to quit as a result of objectively intolerable conditions. In either case, the employer has, through objectively intolerable conditions, forced the employee out of active service. We believe it is sufficient for a plaintiff to prove that an employer deliberately rendered working conditions intolerable and thus forced the employee to permanently "leave" the employment; the employee need not prove that she technically "quit" in every case.

Viewed in the light cast by *White*, the allegation that Ms. Murphy-Taylor was constructively discharged is not incompatible with the fact that thereafter she was actually discharged. Rather, the United States has permissibly pleaded distinct and alternative claims based on distinct legal theories. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.") For instance, in the event that a fact-finder were to conclude that the Sheriff's actual termination of Ms. Murphy-Taylor's employment in May 2011 was not motivated by retaliation but was motivated by Ms. Murphy-Taylor's exhaustion of her leave, the United States would not be foreclosed from arguing that the reason Ms. Murphy-Taylor exhausted her leave was that she was constructively discharged in July 2010 due to the intolerable conditions of her workplace.

In sum, I reject the State Defendants' challenges to the Title VII claims lodged by the United States.

## D. Title VII: County Liability

The County disputes the viability of both plaintiffs' and the United States' Title VII claims against it on another substantive basis: the County contends that it was not Ms. Murphy-Taylor's "employer" within the meaning of Title VII, and so it cannot be held liable for employment discrimination and employment-related retaliation against her.

"Identification of an 'employer' under Title VII is a question of federal law." *Carver v. Sheriff of LaSalle County*, 243 F.3d 379, 382 (7th Cir. 2001) (emphasis omitted) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754-55 (1998)); *accord Robinson v. Sappington*, 351 F.3d 317, 339 n.14 (7th Cir. 2003), *cert. denied*, 542 U.S. 937 (2004); *Kronk v. Carroll County*, Civ. No. L-11-277, 2012 WL 245059, at *4 n.4 (D. Md. Jan. 25, 2012) ("[I]n Title VII cases, the existence of an employer-employee relationship is a question of federal law . . . ."). Recent appellate decisions have clarified that a defendant's qualification as the "employer" of a Title VII plaintiff constitutes a substantive "element of [the] plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006); *accord Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155 (4th Cir. 2013) ("[T]he issue of whether the Chapter is an 'employer' under the ADA is non-jurisdictional in nature.") (citing *Arbaugh*).

Title VII defines an "employer" to include "a person engaged in an industry affecting commerce who has fifteen or more employees." 42 U.S.C. § 2000e(b). Title VII's statutory definition of a "person" includes, *inter alia*, "governments, governmental agencies, [and] political subdivisions." *Id.* § 2000e(a). Circularly, the term "employee" is defined, with exceptions not relevant here, as "an individual employed by an employer." *Id.* § 2000e(f). The statute leaves undefined the core concept of employment—what it means to "employ" someone.

In light of this Congressional silence, the Supreme Court has prescribed a "uniform and predictable standard . . . established as a matter of federal law," *Ellerth*, 524 U.S. at 754, for determination of when an employer-employee relationship exists under federal employment discrimination law, stating that "'Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 (2003) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992)).[26]

Plaintiffs and the United States contend that the Sheriff, the State, and the County were all "employers" of Ms. Murphy-Taylor, under a judicially-recognized "joint employer" doctrine, by which two or more separate entities may be considered employers of the same employee. The Fourth Circuit has recognized and applied a joint employer doctrine in other statutory contexts. *See, e.g.*, *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 305-06 (4th Cir. 2006) (holding that Saudi prince and private security firm were joint employers of bodyguards under Fair Labor Standards Act); *NLRB v. Jewell Smokeless Coal Corp.*, 435 F.2d 1270 (4th Cir. 1970) (holding that coal processing company and coal mining company were joint employers under National Labor Relations Act). But, it does not appear to have specifically considered whether to apply it in the employment discrimination context. *But see Jordan v. Alt. Resources Corp.*, 458 F.3d 332 (4th Cir. 2006) (affirming judgment in Title VII case in favor of alleged joint employers, without reaching issue of whether defendants were joint employers), *cert. denied*, 549 U.S. 1362 (2007).

---

[26] The Supreme Court has also looked to common-law agency doctrine to resolve questions concerning whether an employer-employee relationship exists in several other statutory contexts where statutory definitions do not resolve the question, including in the context of the Employee Retirement Income Security Act ("ERISA"), *see Darden*, 503 U.S. 318, and the Copyright Act, *see Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989).

Nevertheless, the Fourth Circuit has applied a similar "integrated employer" doctrine, by which, under certain circumstances, a parent company and its subsidiary can be considered a single employer for purposes of Title VII liability. *See Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999) ("[A] defendant that does not directly employ the plaintiff may still be considered an employer under [civil rights] statutes."), *cert. denied*, 529 U.S. 1116 (2000). And, other circuits have applied the joint employer doctrine in cases arising under Title VII and other employment discrimination laws. *See, e.g.*, *Sandoval v. City of Boulder*, 388 F.3d 1312 (10th Cir. 2004); *Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997).

Although there are various formulations of the test for joint employer or integrated employer status, the formulations all are directed at "analyzing the amount of control the alleged joint employer had over employees." *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (emphasis omitted); *see Sandoval*, 388 F.3d at 1323 ("'[C]ourts look to whether both entities exercise significant control over the same employees.'") (citation omitted); *Bristol v. Bd. of County Comm'rs of County of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002) ("Courts . . . treat independent entities as joint employers if the entities 'share or co-determine those matters governing the essential terms and conditions of employment.'") (citation omitted); *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999) ("[W]here . . . one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as 'joint employers' and aggregate them."); *Graves*, 117 F.3d at 727 ("[W]hen an entity exercises sufficient control over employees it may be considered a 'joint employer.'").

Albeit not in the context of a joint employer analysis, the Fourth Circuit has said that "'[w]hether an individual is an employee [for Title VII purposes] . . . is properly determined by *analyzing the facts of each employment relationship* under a standard that incorporates both the common law test derived from principles of agency and the so-called "economic realities" test,'" which asks whether putative employees "'as a matter of economic reality are dependent upon the business to which they render service.'" *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 220 (4th Cir. 1993) (emphasis added) (determining whether unpaid volunteer firefighter was "employee" of fire company for Title VII purposes) (quoting *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 981 (4th Cir. 1983) (determining whether putative independent contractor was "employee" for purposes of Age Discrimination in Employment Act)) (some citations omitted).

In this case, the parties do not dispute the viability of the joint employer doctrine, as a matter of law. However, the County vigorously disputes whether it was Ms. Murphy-Taylor's joint employer. Under Maryland's Constitution, county sheriffs are independently elected constitutional officers. *See* MD. CONST., Art. 4, § 44. As a matter of Maryland State law, it is well settled that, as a general rule, county sheriffs and their deputies are "officials and/or employees of the State of Maryland," rather than their county. *Rucker v. Harford County*, 316 Md. 275, 281, 558 A.2d 399, 402 (1989). Thus, for purposes of tort liability in Maryland, sheriffs and their deputies are generally considered State personnel. *See* Md. Code (2009 Repl. Vol., 2012 Supp.), § 12-101(a)(6) of the State Government Article ("S.G.") (providing that sheriffs and their deputies are State personnel under the Maryland Tort Claims Act).

However, the Maryland Court of Appeals has stated that, "for some purposes and in some contexts, a sheriff may . . . be treated as a local government employee," such as for issues

involving "local funding of sheriff's offices" or a sheriff's entitlement to local government employee benefits. *Rucker*, 316 Md. at 289, 558 A.2d at 406. Maryland law "generally provides that the salaries, office expenses and traveling expenses, including automobiles, of the sheriffs' offices shall be paid by the counties." *Prince George's County v. Aluisi*, 354 Md. 422, 434, 731 A.2d 888, 895 (1999). In Queen Anne's County, the County Code provides that sheriff's deputies "[s]erve under the direct supervision of the Sheriff of Queen Anne's County in accordance with Maryland state law," County Code § 27-11.C(2), but they are subject to the provisions of the County Human Resources ordinance (Chapter 27 of the County Code) with respect to holidays and leave, employee recognition, employee benefits, personnel records, and almost all regulations concerning conditions of employment. *Id.* § 27-11.C(1). The only provisions of the Human Resources Ordinance concerning conditions of employment from which deputy sheriffs are exempt are the County labor-management policy, *see* County Code § 27-72 and, notably, County policies regarding "all forms of harassment, sexual and otherwise." *Id.* § 27-80; *see id.* § 27-11.C(1).

The County insists, nevertheless, that it cannot be considered Ms. Murphy's joint employer as a matter of law. It relies upon decisions of this court that have held that a county was not liable for the conduct of sheriffs or their deputies under various civil rights statutes. *See, e.g.*, *Strickland v. Carroll County*, Civ. No. ELH-11-622, 2012 WL 401075, at *31-32 (D. Md. 2012); *Paulone v. City of Frederick*, 787 F. Supp. 2d, 360, 374-78 (D. Md. 2011). As plaintiffs and the United States point out, however, these cases are distinguishable in that they concerned whether a county would be liable for alleged civil rights violations committed against private citizens by deputy sheriffs acting in a law enforcement or correctional capacity, rather than

liability to an employee of a sheriff's office concerning conditions of employment.[27]

Plaintiffs and the United States argue that whether an entity is a plaintiff's "employer" for purposes of Title VII is a fact-bound question that is not appropriate for resolution as a pure matter of law, before discovery. The case law supports their position. Courts performing a joint employer analysis have stated that "the precise contours of an employment relationship can only be established by a careful factual inquiry." *Graves*, 117 F.3d at 729; *see also Moldenhauer*, 536 F.3d at 644 ("[T]he ultimate determination [of joint employer status] will vary depending on the specific facts of each case."); *Muhammad v. Dallas County Cmty. Supervision & Corr. Dept.*, 479 F.3d 377, 382 (5th Cir. 2007) (stating that the "'hybrid economic realities/common law control test' is necessarily a fact-specific inquiry and is therefore typically applied in a summary judgment context," and holding that district court erred in determining, as a matter of law at motion to dismiss stage, that county corrections department was not the "employer" of county probation officer for Title VII purposes and that, instead, the district judges of the county judicial district were probation officer's "employers"); *cf. Robinson*, *supra*, 351 F.3d at 338 (remarking, in response to county's argument that, as a matter of law, the state rather than the county was the "employer" of state judge's secretary, that "the question of joint [employer] liability [under Title VII] is . . . fact-bound," but rejecting county's argument against liability on other grounds).

_____

[27] It is also noteworthy that *Paulone* and *Strickland* involved sheriffs in counties other than Queen Anne's County. A complication in the analysis of potential employer liability of a Maryland county for a deputy sheriff's employment discrimination claims is that the statutory provisions delineating the relationship between a county and its sheriff with respect to personnel matters are not uniform. Indeed, they vary dramatically. *See generally* Md. Code (2013 Repl. Vol.) § 2-309 of the Courts & Judicial Proceedings Article ("C.J.") (delineating relationship between counties and sheriffs on a county-by-county basis). Thus, it is conceivable that different results might obtain in different counties, depending on the degree of control over the employment relationship allocated to and actually exercised by each county.

The degree of control exercised by the County over employees of the Sheriff's Department is a factual issue that is not fully described by the applicable statutes and ordinances.[28] As the United States observes, *see* County-US Surreply at 9, a factual inquiry is particularly appropriate here, where the employment practices at issue not only involve decisions regarding hiring, firing, and discipline, but also (by virtue of the constructive discharge claims) involve issues related to benefits and leave, which the applicable County Code provisions suggest are administered by the County. *See* County Code §§ 27-11.C(1); 27-88 to -91.

Accordingly, I will deny the County's request for dismissal of the Title VII claims against it on the basis that it was not Ms. Murphy-Taylor's "employer," without prejudice to renewal of this argument in a motion for summary judgment filed after discovery.

### E. § 1983 and Article 24: Sheriff Hofmann and Major Williams

Plaintiffs assert claims against Sheriff Hofmann and Major Williams under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights.

Section 1983 establishes a cause of action against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. It "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In this case, plaintiffs use § 1983 as a vehicle for claims that defendants violated their

---

[28] The County underscores this point by submitting legislative history regarding C.J. § 2-309 in an attempt to show that a statutory provision that appears clearly to give the County Commissioners of Queen Anne's County the authority to "appoint an assistant deputy sheriff," C.J. § 2-309(s)(1)(iv), in practice has "no actual effect or impact." County-US Reply at 7.

rights to due process of law under the Fourteenth Amendment. It is well established that the "Due Process Clause[ ] of the Fourteenth Amendment . . . afford[s] protection to employees who serve the government as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119-20 (1992).[29]

Article 24 is Maryland's constitutional analog to the Due Process Clause of the Fourteenth Amendment, and ordinarily is interpreted *in pari materia* with its federal counterpart. *See, e.g.*, *Doe v. Dept. of Pub. Safety and Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (stating that Article 24 "is *in pari materia* with the Due Process Clause of the Fourteenth Amendment"). Plaintiffs assert the same due process claims under the federal and Maryland constitutional provisions. Neither side asserts that plaintiffs' claims under the Due Process Clause of the Fourteenth Amendment are subject to substantively different standards from their claims under Article 24. Accordingly, and because the federal and State provisions are ordinarily construed *in pari materia*, I will analyze together plaintiffs' federal and State due process claims.[30]

---

[29] In an Order issued on February 20, 2013 (ECF 38), I invited the United States to address, as an amicus, issues concerning defendants' liability under § 1983. The United States declined the invitation, stating: "[T]he United States as plaintiff-intervenor in this case has been authorized by the Assistant Attorney General for the Civil Rights Division to address only the issues relating to Title VII as those are the only issues in this case within the Division's enforcement authority." County-US Opposition at 2 n.1.

[30] Plaintiffs originally brought these claims against the State as well as the Individual Defendants. As noted, after the State Defendants moved to dismiss plaintiffs' complaint, plaintiffs voluntarily dismissed their § 1983 and State claims against the State; they conceded the correctness of the State's position that it is not a "person" subject to suit within the meaning of § 1983, *see Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989) ("a State is not a 'person' within the meaning of § 1983"), and enjoys Eleventh Amendment immunity from suit in federal court with respect to State law claims. *See Penhollow State Sch. & Hosp. v.*

- 44 -

Plaintiffs assert four distinct due process claims, which I will address in turn. One involves substantive due process, discussed, *infra*; the first three assert violations of procedural due process rights. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). So, in order to state a claim for a due process violation, a plaintiff's allegations must implicate a protected liberty or property interest. *Guerra v. Scruggs*, 942 F.2d 270, 277 (4th Cir. 1991); *see, e.g.*, *Mallette v. Arlington County Empls. Supp. Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir.1996) ("[Plaintiff] is entitled to procedural due process only if she holds a constitutionally protected property interest . . . .").

Courts have long recognized that "the fundamental requisite of due process of law is [notice and] the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914); *see LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("[T]he core of due process is the right to notice and a meaningful opportunity to be heard."); *Mullane v. Central Hanover Bank & Trust*

---

*Halderman*, 465 U.S. 89 (1984) (holding that an unconsenting state cannot be sued in federal court for violations of state law).

The State Defendants argue that plaintiffs have sued Sheriff Hofmann and Major Williams only in their official capacities, and thus their § 1983 claims against the Individual Defendants must also be dismissed. *See Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself. . . . [N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). In response, plaintiffs argue that they have properly sued the Individual Defendants in their individual capacities. State-Plaintiffs Opposition at 4. Although plaintiffs' complaint is not entirely unambiguous on this point, I will construe it as asserting claims under § 1983 against the Individual Defendants in their individual capacities.

To the extent that the complaint asserts § 1983 claims against the Individual Defendants in their official capacities, those claims will be dismissed (including as to Hofmann). *See, e.g.*, *J & J Sports*, *supra*, 849 F. Supp. 2d at 592.

*Co.*, 339 U.S. 306, 314 (1950) (observing that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"). Yet "'due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Once it is determined that due process applies, the question remains what process is due."); *see Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 484 (1988).

### 1. Deprivation of Property Interest in Continued Employment

In their first due process claim, plaintiffs argue that Ms. Murphy-Taylor had a property interest in continued employment with the Sheriff's Office, of which she was deprived without due process of law when she was terminated "without just cause and without a pre-termination hearing as required by LEOBR." Amended Complaint ¶ 37.

"'The root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (emphasis in original). "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Loudermill*, 470 U.S. at 542 (citation omitted); *see Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972).

Whether a public employee has "a property interest in his employment is determined by reference to state law." *Carroll v. City of Westminster*, 52 F. Supp. 2d 546, 561 (D. Md. 1999), *aff'd*, 233 F.3d 208 (4th Cir. 2000). "Generally," under Maryland law, "'a non-tenured State or local government employee who serves "at will" is not regarded as having a property right in continued public employment.'" *Higginbotham v. Pub. Serv. Comm'n*, 171 Md. App. 254, 267, 909 A.2d 1087, 1094 (2006) (citation omitted). However, a "property interest in employment," protected from deprivation without due process, "can, of course, be created by ordinance, or by an implied contract," and "[w]hether such a guarantee has been given can be determined only by an examination of the particular statute or ordinance in question." *Bishop v. Wood*, 426 U.S. 341, 344-45 (1976).

The State Defendants assert that plaintiffs' claim is barred by *Elliott v. Kupferman*, 58 Md. App. 510, 473 A.2d 960 (1984). In that case, the Maryland Court of Special Appeals held that LEOBR, a statute that "sets forth certain procedural requirements in connection with investigations and other proceedings that may lead to disciplinary action" for Maryland law enforcement officers, *id.* at 522, 473 A.2d at 966, "as a matter of State law" does "not suffice to give [a law enforcement officer] a property right in his continued employment." *Id.* at 523, 473 A.2d at 967.

In response, plaintiffs do not quarrel with the assertion that LEOBR did not give Ms. Murphy-Taylor a property right in continued employment. However, they contend that *Elliott* is distinguishable because the officer in that case based his claim solely on LEOBR; the *Elliott* Court observed that he did not "allege any direct statutory or contractual entitlement to continued employment, as would be the case, for example, if [the officer] had been employed for a specific

term of years or could be discharged *only* for specific cause." *Id.* at 521, 473 A.2d at 966 (emphasis in original). Plaintiffs assert that, unlike *Elliott*, their claim is not based solely on LEOBR, but is also based on a provision of Maryland law stating that in Queen Anne's County the "Sheriff may not refuse to reappoint a deputy sheriff without just cause." C.J. § 2-309(s)(1)(iii)(2).

The State Defendants protest that plaintiffs' theory under C.J. § 2-309(s)(1)(iii)(2) was "never raised in a pleading," State-Plaintiffs Reply at 3 n.2, and was asserted for the first time in plaintiffs' opposition to the State Defendants' motion. The State Defendants are incorrect. In the relevant portion of their complaint, plaintiffs clearly alleged that Ms. Murphy-Taylor "was an appointed deputy sheriff pursuant to Md. Code, Courts & Judicial Proceedings § 2-309(s) whose reappointment could not be denied without just cause." Amended Complaint ¶ 36. The State Defendants offer no other argument against plaintiffs' claim, except to assert baldly, without analysis or cited authority, that C.J. § 2-309(s)(1)(iii)(2) "has nothing to do with termination" and "does not pertain to reappointment after termination." State-Plaintiffs Reply at 3 n.2.

The Court's research has not uncovered case law discussing the import of C.J. § 2-309(s)(1)(iii)(2) or comparable provisions (the subsections of C.J. § 2-309 concerning sheriffs' deputies in several other counties contain similar provisions). In the absence of authority or analysis offered by the State Defendants, I conclude that they have not met their burden, as the moving parties, to demonstrate that plaintiffs have failed to state a claim upon which relief can be granted.

## 2. *Deprivation of Liberty Interest in Reputation*

Plaintiffs' second due process claim is that "the liberty interest that [Ms. Murphy-Taylor] held in her good name, reputation, honor and integrity was violated without due process when Sheriff Hofmann, Major Williams, and Mr. Hofmann publicized untruths concerning her professional character and ensured that she could never be hired in a law enforcement capacity within the State of Maryland." Amended Complaint ¶ 47.

"[I]njury to reputation by itself [is] not a 'liberty' interest protected under the [Due Process Clause]." *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). However, when "reputational injury [is] accompanied by a state action that 'distinctly altered or extinguished' [the plaintiff's] legal status," such as termination of public employment, a due process claim arises. *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (citation omitted). In other words, "a loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest." *Id.*; *see Roth*, *supra*, 408 U.S. at 573 & n.12 (recognizing that notice and hearing would have been required if "[t]he State, in declining to rehire the respondent, [had made] any charge against him that might seriously damage his standing and associations in his community" or had "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities"). "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir.) (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988)), *cert. denied*, 552 U.S. 1076 (2007).

The State Defendants challenge this claim on the basis of the plausibility pleading standard announced in *Iqbal* and *Twombly*. According to the State Defendants, plaintiffs' pleading provides no "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. They assert: "[O]ne looks in vain throughout the entire thirty-five page complaint for any information at all that tells this Court what the supposed 'untruths' actually were, or that identifies any recipients of them, in order to determine whether it is even plausible that these statements would damage Ms. Murphy-Taylor's standing or otherwise place a stigma on her that would prevent her from finding other employment." State-Plaintiffs Motion at 14. In addition, they argue that "it is clear from the Amended Complaint that any stigmatizing statements about [Ms. Murphy-Taylor] were not made in conjunction with her termination. They were independent of her discharge and were never asserted by Defendants as the reason for her termination." State-Plaintiffs Reply at 7.

Plaintiffs' complaint alleges that the Individual Defendants made "spoken and written comments to other law enforcement agencies within the State of Maryland" that "adversely affected [Ms. Murphy-Taylor's] reputation," Amended Complaint ¶ 127, and that "[f]ollowing her termination, Sheriff Hoffman [sic] and Major Williams made repeated derogatory and offensive statements about Ms. Murphy-Taylor's personal and professional character to members of Maryland's law enforcement community in an effort to ensure that she would not be hired elsewhere." *Id.* ¶ 28. However, plaintiffs have not provided any factual specifics regarding the content of these statements, to whom they were made, and when. In response to the State Defendants' argument, plaintiff cites a particular statement that was recounted in Ms. Murphy-Taylor's original charge of discrimination to the EEOC, which was attached to her complaint.

However, the statement on which plaintiffs rely (an occasion in November 2009 on which Detective Stouffer insinuated that Ms. Murphy-Taylor had sexual relations with another female deputy) far predated her termination and was not made by any of the Individual Defendants. *See* State-Plaintiffs Opposition at 14-15.

In sum, plaintiffs have not articulated any specific allegations whatsoever with respect to the alleged communications to other law enforcement agencies in the wake of Ms. Murphy-Taylor's termination. I agree with the State Defendants that plaintiffs' conclusory pleading is insufficient to satisfy the *Iqbal* and *Twombly* standard. Plaintiffs' "complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, plaintiffs' claims in this regard will be dismissed, without prejudice. If plaintiffs are in possession of factual information that would permit them to craft an amended complaint restating this claim with sufficient specificity, or if they later acquire such information through discovery, they may move pursuant to Fed. R. Civ. P. 15 for leave to file an amended complaint.

### 3. Deprivation of Liberty Interest by Termination for Exercise of Right of Free Speech

Plaintiffs' third due process claim is that "the liberty interest associated with Mrs. Murphy-Taylor's employment was further violated because she was terminated in retribution for the exercise of her right to free speech, protected by the First Amendment of the United States Constitution," Amended Complaint ¶ 48, and "by Art. 40 of the Maryland Declaration of Rights." *Id.* ¶ 150. Article 40 of the Declaration of Rights is Maryland's constitutional counterpart to the provisions for freedom of speech and freedom of the press contained in the

First Amendment. The Maryland Court of Appeals has held that courts ordinarily "need not consider Article 40 and the First Amendment separately as Article 40 is read generally *in pari materia* with the First Amendment." *Nefedro v. Montgomery County*, 414 Md. 585, 593 n.5, 996 A.2d 850, 855 n.5 (2010).

The right of free speech, as guaranteed by the First Amendment, "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993).

A public employer contravenes a public employee's First Amendment rights when it discharges or "refuses to rehire [the] employee," or when it makes decisions relating to "promotion, transfer, recall, and hiring based on the exercise of" that employee's free speech rights. *Suarez Corp. Indus.*, 202 F.3d at 686 (internal quotation marks omitted). A public employee seeking to assert a free speech retaliation claim must satisfy three elements:

> First, the public employee must have spoken as a citizen, not as an employee, on a matter of public concern. Second, the employee's interest in the expression at issue must have outweighed the employer's "interest in providing effective and efficient services to the public." Third, there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action.

*Ridpath v. Bd. of Govs. Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (internal citations omitted).

The State Defendants contend that plaintiffs provide "no specific factual information as to what Ms. Murphy's alleged 'exercise of her right to free speech' was." State-Plaintiffs

Motion at 15. However, plaintiffs' complaint is replete with allegations regarding Ms. Murphy-Taylor's internal complaints,[31] her filing of charges with the EEOC,[32] and her initiation of criminal proceedings against Hofmann.[33] Recognizing that these actions can be construed as exercises of free speech, the State Defendants do not challenge whether these activities qualify for First Amendment protection. Rather, they assert a fallback argument: that plaintiffs fail sufficiently to plead causation. Their argument in this regard, however, is the same one that I have already rejected with respect to the United States' pleading of causation as to its Title VII

---

[31] To be sure, the Supreme Court said in *Borough of Duryea v. Guarnieri*, ___ U.S. ___, 131 S. Ct. 2488, 2501 (2011), that the "forum in which a petition is lodged will be relevant to the determination of whether the petition relates to a matter of public concern," and that a "petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context," often not satisfying the public concern test. The Court observed that "[e]mployees may file grievances on a variety of employment matters, including working conditions, pay, discipline, promotions, leave, vacations, and terminations," *id.* at 2496, and was leery of use of the First Amendment to "constitutionalize the employee grievance." *Id.* at 2497 (citation and internal quotation marks omitted).

Arguably, Ms. Murphy-Taylor's internal complaints of sexual harassment and sexual assault rose above the level of the run-of-the-mill workplace grievance and constituted matters of public concern. *But see Morgan v. Ford*, 6 F.3d 750, 754-55 (11th Cir. 1993) (holding that employee's complaints of sexual harassment were designed to improve her own working conditions, rather than to raise issues of public concern), *cert. denied*, 512 U.S. 1221 (1994). However, I need not definitively resolve whether Ms. Murphy-Taylor's internal complaints satisfied the public concern test as elucidated in *Guarnieri* in light of her filing of her EEOC charge and her pressing of charges against Hofmann.

[32] *See, e.g.*, *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) ("'[F]iling of an EEOC charge [is an] activit[y] protected by the first amendment.'") (citation omitted).

[33] *See, e.g.*, *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004) (concluding that swearing out a criminal complaint for assault and seeking assailant's arrest were "protected by the First Amendment"); *Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564, 568, 571 (E.D. Tex. 2003) (noting that "[t]here is no doubt that filing a legitimate criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right" and is "certainly a matter of public concern").

retaliation claims. Accordingly, for the same reasons, I reject the State Defendants' causation argument in this context.

### 4. Deprivation of Substantive Due Process

Plaintiffs' final due process claim concerns substantive due process. They frame their substantive due process claim as follows: "[B]oth Mrs. Murphy-Taylor's property interest and her liberty interest in her employment were impaired and ultimately denied for a manifestly improper purpose: to exact retribution on her for exposing Mr. Hofmann's sexual attacks on her." Amended Complaint ¶ 51. Plaintiffs characterize the Individual Defendants' alleged actions as "an extreme abuse of governmental power," *id.* ¶ 52, "motivated solely by their desire to pursue a personal vendetta against Mrs. Murphy-Taylor," *id.* ¶ 53, and "made in bad faith." *Id.* ¶ 54. According to plaintiffs, the Individual Defendants' "abuse of the public trust and manipulation of governmental procedure . . . shocks the conscience and amounts to a substantive due process violation." *Id.* ¶ 55.

As already discussed, the "standard analysis" under the Due Process Clause is a *procedural* due process inquiry that asks "whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, ___ U.S. ___, 131 S. Ct. 859, 861 (2011). "[S]ubstantive due process is a substantially narrower concept than procedural due process, for it serves as 'an absolute check on certain governmental actions *notwithstanding* the fairness of the procedures' used to implement those actions." *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 287-88 (4th Cir. 1998) (citation omitted) (emphasis in *Front Royal*). "[T]his absolute check is warranted only where *no process* could cure the

deficiencies in the governmental action." *Id.* at 288 (internal citation omitted) (emphasis in original).

One thread of substantive due process case law, directed at legislative enactments, extends substantive due process protection to "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted). The substantive due process doctrine "'forbids the government to infringe . . . "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Id.* at 721 (citation omitted) (emphasis in original).

Another thread of substantive due process case law is directed at executive action. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (distinguishing between substantive due process analysis of legislation, as outlined in *Glucksberg*, and substantive due process analysis of executive action). The executive action thread of the substantive due process doctrine posits that "the Due Process Clause was intended to prevent government officials 'from abusing [their] power, or employing it as an instrument of oppression.'" *Id.* at 846 (citations and some internal quotation marks omitted). Notably, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.*; *accord see Huggins v. Prince George's County*, 683 F.3d 525, 535 (4th Cir. 2012); *Wolf v. Fauquier County Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009) ("Only abuse of power which 'shocks the conscience' creates a substantive due process violation.") (citation omitted).

"Defining conduct that shocks the conscience does not draw on any traditional standard of liability from tort law but rather refers, as a constitutional construct of substantive due process, to 'conduct intended to injure in some way unjustifiable by any government interest.'" *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317, 321 (4th Cir.) (citation omitted), *cert. denied*, ___ U.S. ___, 133 S. Ct. 616 (2012). In the context of a voluntary employment relationship, conduct by the governmental employer that rises to the level of deliberate indifference "would not support a substantive due process violation." *Id.* at 322 (citing *Collins*, *supra*, 503 U.S. at 128). Rather, "in the voluntary employment context," the employee plaintiff must show that the governmental employer defendant "*intended to harm*" its employee in order to "establish a substantive due process violation." *Slaughter*, 682 F.3d at 322 (emphasis in original). The Supreme Court has cautioned: "The Due Process Clause 'does not purport to supplant traditional tort law,'" and therefore, it should not "be interpreted to impose federal duties that are analogous to those imposed by state tort law." *Collins*, *supra*, 503 U.S. at 128 (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)).

In briefing this issue, the State Defendants addressed only the legislative strain of substantive due process, and argued that neither the Maryland appellate courts nor the Fourth Circuit have recognized a fundamental right to continued government employment. *See* State-Plaintiffs Motion at 16; State-Plaintiffs Reply at 4-5. Plaintiffs agree that there is no fundamental right to government employment and expressly stated in their opposition that their claim arose instead under the executive action, shocks-the-conscience branch of the substantive due process doctrine. *See* State-Plaintiffs Opposition at 18. In their reply, the State Defendants provided no argument or analysis addressing the governing legal principles.

Plaintiffs cited a single case, *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000), in which the Sixth Circuit held that a governmental employer violated its employee's substantive due process rights under the shocks-the-conscience standard when it discharged the employee for filing an "internal grievance, asserting that he was being disciplined because of his race," *id.* at 608, which the court held constituted protected First Amendment speech on a matter of public concern. *See id.* at 609. *Perry*'s analysis of the substantive due process issue appears thin. Under *Perry*, it would appear that the shocks-the-conscience threshold would be exceeded whenever a governmental actor violated a plaintiff's fundamental constitutional rights deriving from another source. This would render the shocks-the-conscience doctrine largely redundant (as, ordinarily, a plaintiff would be able to bring a claim directly for the underlying constitutional violation), and would not limit the doctrine to the truly egregious cases of governmental abuse to which it is addressed.

The Court's research uncovered *Hawkins v. Holloway*, 316 F.3d 777, 785-88 (8th Cir. 2003), which is instructive. In that case, the Eighth Circuit considered substantive due process claims against a sheriff brought by several of his employees for a variety of abusive workplace behavior. On some occasions, "while the sheriff was purportedly engaging in office horseplay, he grabbed, touched, or brushed [officers'] clothed erogenous zones or other sensitive areas of their body, and made sexually suggestive comments when doing so." *Id.* at 784. The court described this conduct as "offensive and despicable, and certainly inexcusable," *id.*, but it determined that the actions fell "into the category of misconduct for which no constitutional remedy is available" under a substantive due process theory. *Id.* at 785. Noting that "the sheriff's touchings were not accompanied by threats of official action if the employees rebuffed

or complained of his perverted and juvenile behavior," *id*., the court said: "Not every inappropriate or unwanted touching by a public official, even if accompanied by vulgar comments of a sexual nature, can amount to the 'brutal and inhumane abuse of official power' necessary to demonstrate a violation of an individual's bodily integrity sufficient to support a constitutional violation." *Id.* (citation omitted).

On the other hand, the *Hawkins* Court found that two other types of conduct by the sheriff did rise to the level of conscience-shocking behavior that violated his employees' substantive due process rights. As to one employee, the court held that the "sheriff's allegedly repeated intentional touching of her breasts . . . constitute[d] a violation of her bodily integrity sufficient to support a substantive due process claim." *Id.* The court also found a substantive due process violation where the sheriff on several occasions "pointed loaded weapons at [four employees] at close range, often pointing to their genitals, and made direct and forceful threats to kill them or cause grievous bodily injury[,] . . . [becoming] agitated during the incidents, [and with] his finger . . . on the trigger . . . ." *Id.* at 787.

Other case law applying the shocks-the-conscience standard may also shed light on whether the conduct alleged here exceeded the substantive due process threshold. However, as I see it, the State Defendants failed to meet plaintiffs' contentions with applicable argument and analysis. Therefore, rather than attempt to resolve this issue without the benefit of adequate briefing from both sides, I will deny the State Defendants' motion, without prejudice to renewal at the summary judgment stage.

## F.  Abusive Discharge

Count VI of plaintiffs' complaint asserts the tort of abusive discharge.  Tort liability for wrongful discharge or abusive discharge has been recognized in Maryland "as a judicially-created exception to the employment at-will doctrine."  *Newell v. Runnels*, 407 Md. 578, 646, 967 A.2d 729, 769 (2009) (citing *Adler v. Am. Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981)).  The doctrine is narrow, however.  In order to assert a viable claim of abusive discharge, an employee must demonstrate that "a clear mandate of public policy . . . was contravened by the discharge."  *Porterfield v. Mascari II, Inc.*, 374 Md. 402, 423, 823 A.2d 590, 602 (2003).  In order to support an abusive discharge tort claim, a public policy must be "reasonably discernible from prescribed constitutional or statutory mandates."  *Wholey v. Sears Roebuck*, 370 Md. 38, 54, 803 A.2d 482, 491 (2002).  On the other hand, because the purpose of the tort is to "provide a remedy for *otherwise unremedied* violations of public policy," *Porterfield*, 374 Md. at 423, 823 A.2d at 602 (emphasis added), the tort is not viable if the statutes that establish the public policy at issue "already provide an adequate and appropriate civil remedy for the wrongful discharge." *Id.*  In sum, the tort of abusive discharge is limited "to cases where an employee's termination contravened a clear mandate of public policy and not to allow the cause of action would leave the employee without a remedy."  *Newell*, 407 Md. at 647, 967 A.2d at 769; *see Molesworth v. Brandon*, 341 Md. 621, 672 A.2d 608 (1996).

The Individual Defendants contend that plaintiffs' abusive discharge claim must fail in light of *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989).  In *Makovi*, the Maryland Court of Appeals held that "discharge motivated by employment discrimination prohibited by Title VII" cannot support an abusive discharge claim, *id.* at 626, 561 A.2d at 190,

because "the public policy sought to be vindicated by the tort is expressed in a statute which carries its own remedy for vindicating that public policy." *Id.* at 609, 561 A.2d at 182; *but see Molesworth*, 341 Md. 621, 672 A.2d 608 (holding that abusive discharge claim was viable to remedy employment discrimination on the basis of gender where employee could not sue under state law analog to Title VII because her employer was not subject to the statute).

In response, plaintiffs concede that *Makovi* forecloses an abusive discharge claim based on the public policy against sex discrimination that would be actionable under Title VII, but argue that the public policies articulated in Title VII are not the only public policies that undergird their suit. In particular, plaintiffs identify two other public policies implicated by their claims: a public policy against nepotism in public employment articulated in § 27-73 of the Queen Anne's County Code,[34] and a public policy in favor of "whistleblowing" against criminal misconduct. *See* State-Plaintiffs Opposition at 10-11.

In their reply, the Individual Defendants point out that, because the Sheriff is a state officer, he is not subject to the prohibition of nepotism contained in the County Code. Under the Human Resources chapter of the County Code, the Sheriff and his deputy sheriffs are classified as part of the "exempt service," which includes "State officials who by State law are funded by the County and subject to the County budget procedures," County Code § 27-1, and specifically includes the Sheriff and his deputy sheriffs. *See id.* § 27-10.A(4), .D. Although certain provisions of the Human Resources chapter of the County Code, including the prohibition against nepotism, apply to deputy sheriffs, *see id.* § 27-11.C(1), the Sheriff himself is exempt

---

[34] Section 27-23 of the County Code, which plaintiffs mistakenly cite as the anti-nepotism provision, governs salary increases for County employees based on job performance.

from the Human Resources provisions of the County Code. *See id.* § 27-11. Accordingly, the County Code's prohibition against nepotism apparently does not apply to the Sheriff.

However, the Individual Defendants offer no response to plaintiffs' assertion of an abusive discharge claim founded on the public policy to protect whistleblowers, and the Maryland Court of Appeals has recognized that this public policy may serve as the foundation of an abusive discharge claim. In *Wholey v. Sears Roebuck*, *supra*, 370 Md. 38, 803 A.2d 482, the Court of Appeals recognized a "cause of action in wrongful discharge for employees who are discharged for reporting suspected criminal activity to the appropriate authorities." *Id.* at 59, 803 A.2d at 494. The *Wholey* Court recognized the tort in part because the legislature had not "provide[d] a statutory remedy for *private* employee-whistleblowers." *Wholey*, *Id.* at 57, 803 A.2d at 492 (emphasis in original). It noted that "*public* employees of the executive branch are protected under [State law] for reporting, among other things, violations of laws, abuses of authority, and gross mismanagement of funds," *id.* at 57, 803 A.2d at 492 n.11 (emphasis in original) (citing Md. Code, §§ 5-301 *et seq.* of the State Personnel & Pensions Article ("S.P.P.")), thereby suggesting that an abusive discharge tort claim based on retaliation for whistleblowing might not be available to State employees subject to statutory protection under S.P.P. §§ 5-301 *et seq.* However, the employees of a county sheriff in Maryland are not considered employees of the State's executive branch, so as to come within the purview of S.P.P. §§ 5-301 *et seq. See, e.g.*, MD. CONST., Art. 4, § 44 (placing sheriffs within the judicial branch). Moreover, the County Code also establishes an entitlement to whistleblower protection for County employees, including deputy sheriffs, *see* County Code § 27-84; *see also id.* § 27-

11.C(1), but does not provide a civil remedy for violation of the entitlement, which further strengthens the case for an abusive discharge claim.

Of import here, in *Watson v. Peoples Security Life Insurance Co.*, 322 Md. 467, 588 A.2d 760 (1991), the Maryland Court of Appeals held specifically "that it is contrary to a clear mandate of public policy to discharge an employee for seeking legal redress against a co-worker for workplace sexual harassment culminating in assault and battery," *id.* at 480-81, 588 A.2d at 766, and that "the same clear public policy which encourages [an employee's] legal recourse against one who degradingly assaulted her makes tortious a discharge that retaliates against that recourse." *Id.* at 486, 588 A.2d at 769. The *Watson* Court specifically distinguished *Makovi*, stating: "Long antedating Title VII . . . , public policy, as manifested in civil and criminal law, provided sanctions against attempted and consummated harmful and offensive touching of the person, whether or not sexually motivated. . . . By including prior public policy against sexual assaults, the anti-discrimination statutes reinforce that policy; they do not supersede it." *Id.* at 485-86, 588 A.2d at 769.

Accordingly, plaintiffs' abusive discharge claim survives.

## G. Negligence

With respect to plaintiffs' negligence claim, the Individual Defendants argue that plaintiffs fail to sufficiently plead malice or gross negligence, so as to overcome the Individual Defendants' statutory immunity from suit.

Under the Maryland Tort Claims Act ("MTCA"), State personnel, including sheriffs and their deputies, are immune from liability "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Md.

Code (2013 Repl. Vol.), § 5-522(b) of the Courts & Judicial Proceedings Article; *see also* S.G. § 12-101(a)(6) (providing that sheriffs and their deputies are state personnel under the MTCA).[35]

For purposes of MTCA immunity, "malice" refers to so-called "actual malice," *i.e.*, "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Lee v. Cline*, 384 Md. 245, 268, 863 A.3d 297, 311 (2004). Gross negligence means "'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Newell*, *supra*, 407 Md. at 638, 967 A.2d at 764 (citation and internal footnote omitted). Put another way, gross negligence is found when a State employee is so "'utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Id.* at 638, 967 A.2d at 764-65 (citation omitted). "[S]tate personnel are not immune from suit and liability in tort when the plaintiff's complaint *sufficiently* alleges malice or gross negligence." *Barbre v. Pope*, 402 Md. 157, 181-82, 935 A.2d 699, 714 (2007) (emphasis in original).

In my view, plaintiffs' complaint sufficiently alleges gross negligence, so as to overcome Sheriff Hofmann and Major Williams' statutory immunity defense, at least at the pleading stage. Plaintiffs allege that Ms. Murphy-Taylor complained directly to Sheriff Hofmann in August

---

[35] In addition to giving State personnel immunity from suit for non-malicious, non-grossly-negligent torts, the MTCA waives the State's sovereign immunity for such torts, and thereby "'substitutes the liability of the State for the liability of the state employee committing the tort.'" *Bd. of Educ. of Prince George's County v. Marks-Sloan*, 428 Md. 1, 30, 50 A.3d 1137, 1154 (2012). However, the State's waiver of sovereign immunity comes with conditions, one of which is that the State may only be sued in tort "in a court of the State." S.G. § 12-104(a)(1). Plaintiffs in this case initially asserted their tort claims against the State but, as noted, voluntarily dismissed them after the State pointed out that it has not waived immunity from suit in federal court.

2007 regarding sexual harassment and sexual assault by his brother, Hofmann. The Sheriff took no action against his brother and the harassment continued, including the sexual assault in a departmental vehicle in August 2009, as to which Hofmann subsequently pleaded guilty to criminal assault. Although Ms. Murphy-Taylor again complained of harassment and sexual assault to Major Williams in November and December 2009 and February and April 2010, no action was taken in response to her requests to have no contact with Hofmann, even as her charges against him were investigated and after they were substantiated. These allegations, if credited by a fact-finder, could support a finding that Sheriff Hofmann and Major Williams were grossly negligent. Moreover, if the fact-finder credits plaintiffs' claim that Sheriff Hofmann intentionally terminated Ms. Murphy-Taylor's employment in retaliation for pressing charges against his brother, this would be sufficient to support a finding of actual malice. *Cf. Newell*, 407 Md. at 637-39, 967 A.2d at 764-65 (holding that state's attorney could be found to have acted with actual malice and/or gross negligence for firing employees in blatant disregard of their constitutional rights).

Accordingly, I will deny the motion to dismiss plaintiffs' negligence claim against the Individual Defendants.

## H.  Loss of Consortium

In Maryland, an "action for loss of consortium is comprised of two elements: (1) injury to the marital relationship, which is (2) caused by the wrongful conduct of the defendant." *French v. Hines*, 182 Md. App. 201, 267, 957 A.2d 1000, 1037-38 (2008). "A claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of

a third party." *Oaks v. Connors*, 339 Md. 24, 33-34, 660 A.2d 423 (1995) (citing *Deems v. Western Md. Ry. Co.*, 247 Md. 95, 100, 231 A.2d 514 (1967)).

The Individual Defendants argue that plaintiffs' loss of consortium claim should be dismissed because plaintiffs were not married when Ms. Murphy-Taylor was assaulted by Mr. Hofmann and was allegedly harassed by other employees of the Sheriff's Office. As noted, plaintiffs married in May 2010. Under Maryland law, "only injury to a *marital* relationship which exists at the time of the injury can support an action for loss of consortium." *Gillespie-Linton v. Miles*, 58 Md. App. 484, 495, 473 A.2d 947, 953, *cert. denied*, 300 Md. 794, 481 A.2d 239 (1984) (emphasis in original).

In *Gillespie-Linton*, the Maryland Court of Special Appeals held that a married couple's loss of consortium claim was not viable in a suit arising from one spouse's injuries sustained in a car accident that occurred four days before their wedding. *See id.* at 486-87, 473 A.2d at 948-49. The *Gillespie-Linton* Court adopted the reasoning of the Supreme Judicial Court of Maine in *Sawyer v. Bailey*, 413 A.2d 165 (Me. 1980):

> "When the alleged antenuptial tort was committed by the defendant against the woman plaintiff, the man plaintiff suffered no injury, because he possessed no marital right at that time, never having assumed any marital obligations. When Daniel Sawyer later took Lynn Jackson as his lawful wedded wife, he took her for better or for worse in her then existing health, voluntarily taking into himself any marital deprivation that might result from his wife's premarital injury."

*Gillespie-Linton*, 58 Md. App. at 496, 473 A.2d at 954-55 (quoting *Sawyer*, 413 A.2d at 167).

Plaintiffs concede that the rule articulated in *Gillespie-Linton* is an accurate statement of Maryland law, but point out that, although many of the averments of their complaint relate to alleged wrongful acts that occurred before their marriage, several of the alleged acts occurred afterwards. In particular, Ms. Murphy-Taylor went on leave from the Sheriff's Office in July

2010, after having married Mr. Taylor. Her leave-taking allegedly was the culmination of events of harassment and retaliation continuing up to the date of her departure. Moreover, her employment was actually terminated by the Sheriff in May 2010, approximately a year after plaintiffs' marriage.

To be sure, if plaintiffs' loss of consortium claim is tried, it will present challenges of proof. If plaintiffs assert harm to their marital relationship arising from defendants' wrongful conduct, they will need to present evidence that can segregate the effects of Ms. Murphy-Taylor's postnuptial injuries from her prenuptial injuries. However, I agree with plaintiffs that, as a formal matter, they can assert a viable loss of consortium claim based on the Individual Defendants' alleged wrongful conduct occurring after plaintiffs' marriage. Therefore, the loss of consortium claim is not subject to dismissal as a matter of law.

## I.  § 1983: County Liability

The County argues that plaintiffs' § 1983 claims against it fail to allege a basis for its liability, because it had no control over the policies implemented by Sheriff Hofmann, and when the Sheriff established policy, he was acting as a State policymaker, not a county policymaker.

Unlike states, "municipalities and other local government units," such as counties, are "among those persons to whom § 1983 applies." *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," and "may be sued for constitutional

deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91.

However, there "is no respondeat superior liability under § 1983." *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.), *cert. denied*, 543 U.S. 813 (2004). Put another way, local governments "are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, ___ U.S. ___, 131 S. Ct. 1350, 1359 (2011). Thus, whether a county has an employer-employee relationship with particular personnel is immaterial, unlike in the context of Title VII. Rather, "local governments are responsible only for 'their *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)) (emphasis in original). Accordingly, a plaintiff who seeks to impose liability on a municipality under § 1983 must establish that the plaintiff's injury was caused by official municipal policy or custom, *i.e.*, "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359.

In *Connick*, the Supreme Court discussed the narrow circumstances in which a municipality's *failure* to formulate policy and train employees with respect to policy can give rise to § 1983 liability. It said, *id.* at 1359-60 (internal citations omitted):

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."
>
> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ."

Municipal liability under § 1983 only attaches to policies (or equivalent customs or "policies of inaction") established by a municipality's "policymaking officials." *Id.* at 1359. Therefore, one must "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989).

In *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997), the Supreme Court was confronted with an issue similar to the one presented here. *McMillian* concerned the question of whether a county sheriff in Alabama acted as a state policymaker or a county policymaker when engaged in law enforcement functions. The *McMillian* Court articulated "two principles" to guide the inquiry into the identity of a municipality's policymakers. First, the inquiry is not a "categorical, 'all or nothing'" proposition; a court must determine what "governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *Id.* Second, the "inquiry is dependent on an analysis of state law," because whether "'a particular official has "final policymaking authority" is a question of state law.'" *Id.* at 786 (quoting *Jett*, 491 U.S. at 737) (some citations and internal quotation marks omitted) (emphasis omitted). "This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy." *McMillian*, 520 U.S. at 786.

However, the "actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *Id.* Thus, while the *McMillian* Court recognized that different federal circuits had come to different conclusions, in a variety of earlier cases, on whether county sheriffs in various states were state or county policymakers, this lack of national uniformity did not concern the Court. It said: "[S]ince it is entirely natural that both the role of sheriffs and the importance of counties vary from State to State, there is no inconsistency created by court decisions that declare sheriffs to be county officers in one State, and not in another." *Id.* at 795.

In *McMillian*, a closely divided Supreme Court affirmed the decision of the Eleventh Circuit that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties," but acknowledged that Alabama law did not "'speak with perfect clarity'" as to the issue. *Id.* at 793 (citation omitted). And, indeed, the legal structure of sheriffs' relationships with their counties and the state in Alabama, as described by the Supreme Court, appears similar to the structure in Maryland. As noted, as a matter of Maryland law, county sheriffs and their deputies are ordinarily considered "officials and/or employees of the State of Maryland." *Rucker*, *supra*, 316 Md. at 281, 558 A.2d at 402. But, "for some purposes and in some contexts, a sheriff may . . . be treated as a local government employee," such as for issues involving "funding of sheriff's offices" or employee benefits, which generally are administered by the county in which the sheriff serves. *Id.* at 289, 558 A.2d at 406.

One of the earlier federal appellate decisions cited in *McMillian* concerning the status of sheriffs for purposes of § 1983 liability was a decision of the Fourth Circuit involving a Maryland sheriff. In *Dotson v. Chester*, 937 F.2d 920 (4th Cir. 1991), the Fourth Circuit upheld

liability of a Maryland county for a judgment against a sheriff on a § 1983 claim. *Dotson* involved an action brought under § 1983 by inmates regarding conditions of confinement at the county jail in Dorchester County, Maryland, which was operated by the county sheriff. *Id.* at 921. The suit was resolved by a settlement agreement that, among other provisions, allocated the legal fees and costs incurred by the inmates between the county commissioners of Dorchester County and the county's sheriff. *Id.* at 922. After the sheriff failed to pay his share of the judgment, the inmates sought to garnish the county's bank account to satisfy the sheriff's portion of the judgment. *Id.* The federal trial court ruled that the county was liable for the sheriff's portion, as well as its own, because the sheriff was "'a policymaker for the county when operating the Dorchester County Jail.'" *Id.* (quoting district court).

On appeal, the Fourth Circuit reasoned that, under the Supreme Court's decision in *Monell*, "County liability for the Sheriff's operation of the County Jail depends on whether the Sheriff had final policymaking authority for the County over the County Jail." *Dotson*, 937 F.2d at 924. Recognizing that the question of who has "final policymaking authority" is a question of state law, the Dotson Court then embarked on a lengthy survey of Maryland case law regarding county sheriffs and the operation of county jails. *See Dotson*, 937 F.2d at 925-32. Distinguishing *Rucker* and other "Maryland cases discussing the employment status of the sheriff," the Court reasoned that Rucker "does not compel the conclusion that the Sheriff, when managing the County Jail, is a state policymaker." *Id.* at 926. The Court said: "The Sheriff's activities which we investigate—operating the County Jail which houses county prisoners, pursuant to county regulations, and funded by the County—differ from 'the statewide nature' of the Sheriff's duties involved in Rucker." *Id.* at 927 (quoting *Rucker*, 316 Md. at 287-88, 558

A.2d at 405). The Court also recognized that "although the Sheriff . . . now has custody of the County Jail, the County Jail remains a county institution and the County merely has placed final policymaking authority in the Sheriff." *Dotson*, 937 F.2d at 928. It added: "Indeed, from the day the County built the County Jail, the County has been responsible for its conditions and operation." *Id.*

This case is not analogous to *Dotson*; it does not involve delegation by a county to a sheriff of the governance of a particular operation that has historically been a county function, such as management of a county jail. Rather, it involves the working environment within the Sheriff's Office and personnel decisions regarding deputy sheriffs made by the Sheriff and his senior staff. As discussed in connection with the Title VII claims, the County retains some control over personnel matters with respect to deputy sheriffs, such as benefits, leave, and establishment of various policies concerning the conditions of employment. In particular, many provisions of the County's Human Resources Ordinance apply to deputy sheriffs. But, this does not indicate that the Sheriff is a County policymaker with respect to such matters. To the contrary, it indicates that the County itself retains policymaking authority within those areas.

Perhaps the underlying facts would support a *Monell* claim directly against the County for harms to Ms. Murphy-Taylor arising from the County's policies with respect to medical leave, or the explicit exemption of deputy sheriffs from County human resources policies regarding workplace harassment. *See* County Code §§ 27-11.C(1); 27-80. However, no clear claim along those lines has been articulated in plaintiffs' complaint. Rather, the complaint contains boilerplate allegations that, "[a]t all times relevant . . . , Defendants were acting pursuant to municipal custom, policy, or practice in their actions pertaining to Mrs. Murphy-

Taylor." Amended Complaint ¶ 34. This is a mere "formulaic recitation of the elements of [the] cause of action." *Twombly*, 550 U.S. at 555. The complaint also references the "Defendants" generally, or asserts claims against Sheriff Hofmann, Major Williams, and Mr. Hofmann in particular. Even if the County can, in some respects, be viewed as the employer of those individuals, there is no respondeat superior liability under § 1983. *See Love-Lane*, *supra*. With respect to the § 1983 allegations regarding "failure to train and supervise," in particular, *see* Amended Complaint ¶¶ 56 *et seq.*, the complaint refers specifically to "Sheriff Hofmann, Major Williams, Office of the Sheriff and the State of Maryland," *id.* ¶ 56—omitting the County from the list of actors allegedly liable for these claims.

Accordingly, even if a claim of § 1983 liability could be articulated against the County on the basis of the underlying facts, plaintiffs have not sufficiently alleged it. Plaintiffs' complaint fails to state a claim upon which relief can be granted against the County under § 1983. Therefore, Counts I, II, and III, as against the County, will be dismissed, without prejudice. Again, plaintiffs are entitled, pursuant to Fed. R. Civ. P. 15, to move for leave to file an amended complaint restating their § 1983 claims against the County. I express no view as to how the Court might rule on such a motion.

Because plaintiffs' pleading of § 1983 liability against the County is generally deficient, I need not reach the County's more specific arguments against Count III in particular, which asserts a claim of conspiracy to deprive plaintiffs of their federal rights under § 1983. However, I note that Count III remains viable against the Individual Defendants, despite the County's contention that a conspiracy claim cannot be asserted under § 1983 and must instead be asserted under 42 U.S.C. § 1985(3). The County's contention notwithstanding, the Fourth Circuit has

recognized the viability of a civil conspiracy claim under § 1983. It reiterated the elements of such a claim in *Glassman v. Arlington County*, 628 F.3d 140, 150 (4th Cir. 2010) (citation omitted): "'To establish a civil conspiracy claim under [42 U.S.C.] § 1983, [a plaintiff] must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right.'"

## Conclusion

In sum, for the foregoing reasons, the County's motion will be granted in part and denied in part; the State Defendants' motion to dismiss plaintiffs' complaint will be granted in part and denied in part; and the State Defendants' motion to dismiss the United States' complaint will be denied.

In particular, Counts I, II, and III of plaintiffs' complaint (the § 1983 claims) will be dismissed, without prejudice, as against the County. Due to plaintiffs' concession that their State law claims against the County are not viable, Counts VI, VII, VIII, and IX of their complaint will be dismissed, with prejudice, as against the County. Of the claims in plaintiffs' complaint, only Count IV remains viable against the County.

To the extent that plaintiffs assert claims under § 1983 in Counts I, II, and III against the Individual Defendants in their official capacities, those claims will be dismissed, with prejudice. To the extent that plaintiffs assert claims under Title VII in Count IV of their complaint against the Individual Defendants in their individual capacities, those claims will be dismissed, with prejudice. In addition, Counts I and VII of plaintiffs' complaint (asserting claims under § 1983 and Article 24) will be dismissed, without prejudice, as against the Individual Defendants, to the extent that they assert a due process claim for deprivation of Ms. Murphy-Taylor's liberty

interest in her reputation. *See* Amended Complaint ¶¶ 47, 49, 149. Counts VI, VIII, and IX of plaintiffs' complaint remain viable against the Individual Defendants, as do Counts I and VII (except the claims regarding a liberty interest in reputation), and Counts II, III, and IV. (However, Counts I, II, and III are only viable against the Individual Defendants in their individual capacities, and Count IV is only viable against them in their official capacities.)

In all other respects, the motions are denied. The United States' complaint survives the motions to dismiss in its entirety, as against all defendants named in it (*i.e.*, the State, the County, and Sheriff Hofmann in his official capacity).

An Order implementing my rulings follows.


Date: September 11, 2013                    _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge